# METALOR TECHNOLOGIES USA

# ANTI-MONEY LAUNDERING POLICY AND PROGRAM

and

# AML PROGRAM PROCEDURES

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

## AML POLICY

It is the policy of Metalor Technologies USA ("Metalor" or the "Company") to do business only with legitimate, law-abiding customers, and to deny its products and services to all others.

The Company understands that it's precious metals businesses may be a target for certain types of illegal activity, including money laundering, a process by which illegally obtained assets are passed through legitimate businesses, such as Metalor, in seemingly normal transactions. Such assets are thereby converted into other assets, so that it is difficult to trace them back to their illegal origins. If money laundering is successful, it creates an apparent legitimate source for illegal assets, and criminals are able to reap the benefits of their crimes.

Metalor is committed to not being used for illegal purposes, and so is committed to use its best efforts to detect, prevent and deter money laundering, terrorist financing and other illegal activities. The Company will not only comply with all applicable anti-money laundering ("AML") laws and regulations, but will also adopt a comprehensive AML Program, applicable to all divisions, with specific procedures and controls, and will educate and train all employees to implement this policy.

**This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.**
**© Metalor Technologies USA, 2007, all rights reserved**

## AML PROGRAM OUTLINE

In order to implement its AML Policy, Metalor has instituted a series of specific procedures to be carried out by designated company personnel, as described below, with diligence and purpose.

It is understood by Metalor and by the United States government that transactions involving precious metals are vulnerable to money laundering, and also that an AML program can not detect and prevent all such illegal activities.

> "FinCEN does not expect that this program can prevent all potential money laundering. What is expected is that your business will take prudent steps, with the same kind of thought and care that you take to guard against other crimes, such as theft or fraud."
> 70 FR 33714, June 9, 2005

The Metalor AML Program has been designed to take such prudent steps, and to go beyond that standard with additional attention and diligence.

1.     Risk Assessment

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is based upon "the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1)) The Treasury regulation requires that a dealer consider such factors as its products, its business partners, new and old, and whether they also have AML programs, geographic locations, and whether any warnings by governments might be applicable. Metalor engages in a variety of business transactions with hundreds of persons and companies, located throughout the United States and in several other countries. Metalor will examine those business transactions and customers to determine which may be of greater risk, and will then apply more of its resources, and closer scrutiny, to those transactions that are most at risk, both to reduce that risk and to more closely evaluate its customers and the legitimacy of their businesses.

2.     New Customer Approval

Metalor will ascertain and verify the identity and business of its customers, in accordance with risk-based standards and approval procedures, and will do business with only those customers whose source of material or funds is legitimate. An affirmative determination of the legitimacy of a prospective new customer must be made before Metalor will engage in any business with that customer. Existing customers, i.e. those with whom Metalor has active business accounts as of the initiation of this AML Program, will be reviewed, investigated and monitored according to the same standards and approval procedures as new customers. Those customers of Metalor that are dealers in precious metals subject to the requirements of 31 CFR 103.140 will be required by Metalor to have AML programs that are compliant with that regulation. Metalor will terminate business with those existing customers for whom these standards can not be met.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

3.    Monitoring of Customer Transactions

Transactions between Metalor and its customers will be monitored in accordance with risk-based standards and approval procedures intended to detect and flag circumstances, such as significant changes in materials and business volumes, that should be investigated and considered as potentially suspicious activity. Metalor will terminate business with those existing customers for whom such circumstances can not be attributed to legitimate business activities.

4.    Suspicious Activity

All Metalor employees have an affirmative duty to promptly report suspicious activity within the Company. A suspicious activity is something occurring in the course of business that isn't normal, that doesn't seem to work or doesn't seem rational, or that appears to be in violation of law or Company policy. It may appear in discussions or negotiations with customers, or in paperwork such as shipping and customs documents, or in payment practices or requests by customers, or in any other part of Metalor's business activity.

Failure by an employee to report suspicious activity is a violation of Metalor's AML Policy and Program, and may result in discipline of that employee, including termination of employment. On the other hand, there will be no retribution against any employee for making a good faith report of suspicious activity, even if that activity is found to be completely innocent.

The Compliance Officer will investigate any suspicious activity that he or she observes, or that is reported by any person, whether the suspicious activity is reportedly being carried out by customers or employees. All steps taken in the investigation and resolution of that report shall be documented. The Compliance Committee shall be informed and consulted. After completion of the investigation, the Compliance Officer shall determine whether the Company should do, or continue doing, business with a customer, or, if an employee has been reported to have engaged in suspicious activity, that employee should be referred to Human Resources for discipline, including termination.

A report of suspicious activity, standing alone, will not automatically result in any action by the Company other than an investigation, with such diligence as the circumstances warrant. At the conclusion of that investigation, Metalor will not continue to do business with a customer determined to be involved in illegal activity. If, however, a report of suspicious activity can not be definitively resolved, and the Compliance Officer believes that efforts of further investigation are unlikely to lead to such resolution, the Compliance Officer will determine if, in his or her best business judgment, taking into account the potential risks and consequences of action and inaction, the Company should cease, or continue with or without conditions, doing business with the customer.

If the Compliance Officer determines that it is appropriate, he or she will report suspicious activity to the United States government, following procedures for such reports. In order to promote orderly reporting and prevent mistakes, no Metalor employee other than the Compliance Officer is authorized to speak for the company in filing such government reports.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

5.    Training of Employees

Metalor will train all employees, as appropriate to their positions and responsibilities, to assist the Company in implementing its AML Policy and Program, including requirements of anti-money-laundering laws and regulations, specific procedures for collection and verification of customer information, and how to identify and report "red flags" and suspicious activities.

The Compliance Officer will determine the educational resources, including outside seminars and other training and advice, that he or she needs to effectively carry out all duties assigned within the AML Program. Other members of the Compliance Committee will be trained within the company, and the Compliance Committee will determine whether outside training is appropriate and necessary. The Compliance Officer will train all other Metalor employees, as necessary and appropriate to their specific job functions. Training will be repeated as necessary to maintain a current awareness of legal requirements and Company AML Program changes, but not less frequently than annually.

All new employees will be trained as appropriate before engaging in any customer transactions.

6.    Compliance with the Bank Secrecy Act

The foundation of legal anti-money laundering requirements for financial institutions is the Bank Secrecy Act of 1970, as amended from time to time, and specifically as amended by the USA PATRIOT Act of 2001, which, among other things, directed that all dealers in precious metals, stones or jewels have an anti-money laundering program. The Metalor AML Policy and Program will be in compliance with all applicable requirements of the Bank Secrecy Act.

7.    Compliance Officer

Metalor's AML Policy and Program will be carried out by a Compliance Officer, with the assistance of and review by a Compliance Committee. The Compliance Officer has overall responsibility for, and is authorized and directed to implement, oversee and coordinate, the AML Policy and Program. The Compliance Officer's authority includes use of all necessary and appropriate resources and personnel to achieve those ends.

8.    Compliance Committee

The Compliance Officer will be aided in carrying out his or her responsibilities by a Compliance Committee, made up of Metalor's Chief Financial Officer, Manager of Human Relations, and the Compliance Officer. The Compliance Committee shall periodically review and oversee the work of the Compliance Officer, provide recommendations as it deems appropriate, and shall report directly to company senior management where it deems that circumstances require such reporting.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

9.    Record Retention

Metalor will retain all customer and anti-money laundering-related documents (in electronic or original form) for five (5) years, or longer if required by law.

10.    Reporting

The Compliance Officer will regularly report to the General Manger about the implementation and enforcement of the AML Policy and Program.

The Compliance Officer will file all required government reports, and such other reports related to anti-money laundering activity as he or she deems appropriate.  No other Metalor employee is authorized or permitted to file such government reports.

11.    Independent Audit

The Compliance Officer shall arrange for an independent review and audit of the implementation of Metalor's AML Program, to be performed at the end of each calendar quarter.  The audit report will be submitted to Metalor's General Manager and to such other persons as he or she shall direct.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

## RISK ASSESSMENT

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1))  This evaluation is intended to fulfill the requirement of a risk assessment, and to guide the implementation of Metalor's AML Program.

The Treasury regulation requires that:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> (A) The type(s) of products the dealer buys and sells, as well as the nature of supplier; and the dealer's customers, suppliers, distribution channels, and geographic locations;
> (B) The extent to which the dealer engages in transactions other than with established customers or sources of supply, or other dealers subject to this rule; and
> (C) Whether the dealer engages in transactions for which payment or account reconciliation is routed to or from accounts located in jurisdictions that have been identified by the Department of State as a sponsor of international terrorism under 22 U.S.C. 2371; designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member and with which designation the United States representative or organization concurs; or designated by the Secretary of the Treasury pursuant to 31 U.S.C. 5318A as warranting special measures due to money laundering concerns.
> 31 CFR 103.140(c)(1)(i)

Metalor engages in a variety of business transactions with hundreds of persons and companies, located throughout the United States and in other countries.  Some of these transactions are small, simple, and one-time, such as a sale of a small amount of pure silver to a university laboratory.  Other transactions are part of large, longstanding trade relationships with publicly traded companies, such as regular sales of gold plating salts to an electronic equipment manufacturer, and refining of returned plating solutions.  Still other transactions begin with toll refining of gold-bearing scrap for collectors located in the United States, or in other countries, followed by Metalor's purchase of the contained gold.

As these examples show, some transactions present little risk of use by criminals to launder illegal assets.  Money laundering seeks to convert an illegally derived asset into an asset that is readily marketable within an ordinary financial system, so that the criminal can use it to purchase desirable goods.  If an illegally derived asset is instead converted into small batches of laboratory chemicals, or into industrial chemicals with value to a relatively limited industrial application, the laundering is less effective, if it is effective at all.  Other Metalor transactions, on the other hand, present much greater risk.  Metalor gold grain can be used virtually as money in parts of the world, and can be converted to money almost everywhere.  As a central part of its AML Program, Metalor will evaluate all of its business transactions to determine which may be of greater risk.  The Company will then apply more of its resources, and closer scrutiny, to those

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

transactions that are most at risk, both to reduce that risk and to more closely evaluate its customers and the legitimacy of their businesses.

The considerations listed by the Treasury regulation require expansion and explanation in greater detail, and it is easiest to take them in reverse order.

Consideration (C) requires, essentially, that Metalor check any foreign countries that are involved in a transaction against three lists of designated "bad" countries:

- Sponsors of international terrorism,
- Non-cooperative with international anti-money laundering efforts, or
- Warranting special anti-money laundering measures.

The jurisdictions that are currently designated as sponsors of international terrorism by the U.S. Department of State are:

| Country | Designation Date | Rescinded |
| --- | --- | --- |
| Cuba | March 1, 1982 | |
| Iran | January 19, 1984 | |
| Libya | December 29, 1979 | July 13, 2006 |
| North Korea | January 20, 1988 | |
| Sudan | August 12, 1993 | |
| Syria | December 29, 1979 | |

The Treasury regulation does not prohibit Metalor from dealing with a customer located or dealing in one of these jurisdictions, but the Metalor AML Program requires additional scrutiny of any transaction involving these countries. The Compliance Officer is required to maintain a current awareness of new designations and advise the Compliance Committee.[1]

Currently, and since October 13, 2006, there are no jurisdictions that are currently designated as non-cooperative by the Financial Action Task Force (FATF), an international organization of twenty-nine countries concerned with money laundering.[2]  Again, the Treasury regulation does not prohibit Metalor from dealing with a customer in jurisdictions designated by the FATF as non-cooperative, but the Metalor AML program requires additional scrutiny of any such transaction. The Compliance Officer is required to maintain a current awareness of new designations and advise the Compliance Committee.[3]

---

[1] The U.S. Department of State website with this information is at http://www.state.gov/s/ct/c14151.htm.

[2] http://www.fatf-gafi.org/

[3] The FATF publishes an annual report of its designations and progress with designated countries.  http://www.fatf-gafi.org/dataoecd/41/26/34988035.pdf

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

Treasury has designated both countries and specific banks as warranting special measures due to money laundering concerns:

| | Finding** | Notice of Proposed Rulemaking | Final Rule | Rescinded |
|---|---|---|---|---|
| Asia Wealth Bank | | 11/25/03 | 4/12/04 | |
| Banco Delta Asia | 9/15/05 | 9/15/05 | 3/14/07 | |
| Belmetalnergo (Includes Infobank) | | 9/30/04* | --- | |
| Burma | | 11/25/03 | 4/12/04 | |
| Commercial Bank of Syria (Includes Syrian Lebanese Commercial Bank) | | 5/18/04 | 3/09/06 | |
| First Merchant Bank OSH Ltd. | | 8/24/04* | --- | |
| First Merchant Finance Ltd. | | 8/24/04* | --- | |
| First Merchant International Inc. | | 8/24/04* | --- | |
| First Merchant Trust Ltd. | | 8/24/04* | --- | |
| FMB Finance Ltd. | | 8/24/04* | --- | |
| Infobank (Includes Belmetalnergo) | | 8/24/04* | --- | |
| Multibanka | | 4/21/05 | --- | 6/12/06 |
| Myanmar Mayflower Bank | | 11/25/03 | 4/12/04 | |
| Nauru | 12/26/02 | 4/17/03 | --- | |
| Ukraine | 12/26/02 | | --- | 4/17/03 |
| VEF Banka | | 4/21/05 | 6/12/06 | |

* 9/30/04 notice extended the comment period
** For any institutions/jurisdictions without a link in this column, FinCEN issued the finding in the same notice as the proposed rulemaking in the adjacent column

As with the other classifications of countries and jurisdictions of AML concern, the AML Rule does not prohibit Metalor from dealing with a customers associated with these countries and banks. The special measures actually imposed by Treasury are limited to a prohibition of maintaining a correspondent account with a designated financial institution or any financial institution in a designated country, and a precious metals transaction will probably not involve such an account. Furthermore, all of these countries and banks are outside of the areas in which Metalor Technologies USA normally would do business. Nevertheless the Metalor AML program requires scrutiny of all transaction, and that the Compliance Officer maintain current awareness of new designations.[4]

---

[4] http://www.fincen.gov/reg_section311.html

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Consideration (B) requires that Metalor look more closely at prospective transactions with new customers, and/or customers who are not themselves dealers subject to the U.S. requirement of an AML program. The assumption by Treasury is that regular, established customers, especially long-established customers, are already known, and, more important, are known to be in legitimate precious metals businesses. As Treasury has put it:

> "business you conduct with other U.S. dealers subject to the rule, and established customers or suppliers, presents a relatively low level of risk"
> 70 FR 33714, June 9, 2005

> "reasonable inquiry with respect to an established customer may not involve additional steps beyond those normally required to complete the transaction"
> 70 FR 33710, June 9, 2005

FinCEN has defined "established customer" for anti-money laundering purposes as follows:

> *Established customer.* A person with an account with the financial institution, including a loan account or deposit or other asset account, or a person with respect to which the financial institution has obtained and maintains on file the person's name and address, as well as taxpayer identification number (*e.g.,* social security or employer identification number) or, if none, alien identification number or passport number and country of issuance, and to which the financial institution provides financial services relying on that information.
> 31 CFR 103.11(*l*)

Metalor does not engage in any precious metal transactions without the establishment of an account. That isn't to say that Metalor's long-established customers may not engage in money laundering, or be victimized by money launderers, and it does not remove such customers from the scope of the Metalor AML Program. That Program provides that all customers, including long-established ones, will be evaluated with the same standards and procedures. But this Treasury regulation effectively directs Metalor to focus first upon new customers, those that the Company does not know, and to recognize that transactions with new, one-time customers may be particularly vulnerable to attempts at money-laundering.

With regard to "dealers subject to this rule," FinCEN has added its emphasis to this direction:

> "Language has been added .. *to require dealers to take into account the potential risks involved in engaging in transactions with persons who are not subject to this rule.*"
> 70 FR 33710, June 9, 2005

> "FinCEN expects persons engaged in the business of buying and selling covered goods to *take reasonable steps to determine whether a supplier is covered by this interim final rule* or whether the supplier is eligible for the retailer exemption."
> 70 FR 33712, June 9, 2005

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

"[B]usiness you conduct with other U.S. dealers subject to the rule, and established customers or suppliers, presents a relatively low level of risk."
70 FR 33714, June 9, 2005

Consideration (A) broadly requires that Metalor look at its customers and transactions for types that may suggest vulnerability. This is not a direction that any type of customer or transaction is prohibited, but is intended to focus attention. The specific assessment considerations listed in the regulation – "type(s) of products the dealer buys and sells, as well as the nature of the dealer's customers, suppliers, distribution channels, and geographic locations" – require expansion and explanation in greater detail.

- "The type(s) of products the dealer buys and sells"

Metalor Technologies USA operates through a wholly-owned subsidiary, Metalor USA Refining Corporation, which provides refining services and sales of pure precious metals, and through its Advanced Coatings Division, which makes and sells fabricated precious metal products for surface applications in industry, such as plating chemicals. The risks and vulnerabilities to being used by a money launderer differ, because the types of products and customers are very different. While all Metalor operations are encompassed by the AML Policy and Program, the Program Procedures, including customer identification and due diligence, should be risk based, and accordingly should also differ.

Refining

Metalor Refining performs refining services for customers on a toll basis, and then either returns or purchases the customer precious metal. The refining processes produce a very high quality gold bullion, and the Metalor sells this bullion to a number of personal and corporate purchasers. Treasury has noted that precious meals are "transportable, highly concentrated forms of wealth ... international mediums of exchange that can be converted into cash anywhere in the world ... [with] a ready, actively traded market ... [that] can be melted and poured into various forms ... virtually untraceable." So a precious metal transaction involving high metal value in small, readily negotiable forms, would seem to be vulnerable. Thus a proposed transaction in small gold bars, such as kilobars, or gold grain, should be considered vulnerable, and should require close AML Program attention. A purchase of karat gold jewelry scrap for refining would seem to be vulnerable, and prompt settlement, or a substantial advance, would add to that risk. Metalor's purchase of silver flake from photo developing, on the other hand, would seem to be less vulnerable, because the flake is much less valuable, and the market would be more limited. It would not be excluded from the Metalor AML Program, but would not require additional attention. Refining of gold and gold bullion customers represent the largest potential risk for money laundering, because the customer refining lots, particularly those from collectors, may be of unknown origin, and the gold bullion may be used to transfer assets into other markets. For most Metalor Refining customers, more due diligence is usually required than for the customers of the other divisions. However, within Metalor Refining, necessary due diligence will vary on a risk basis. A proposed refining transaction for a South American collector, for example, will need more investigation than a proposed refining transaction for a large, well established jewelry manufacturer in the US, even if similar in types and amounts of material.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

Advanced Coatings

The products sold by the Metalor Advanced Coatings Division are:

- precious metal electroplating salts of gold, silver and palladium that are used to electroplate decorative and industrial products with precious metal coatings;
- silver powder and flakes which are used in electronic and electrical applications; and
- silver alloy strip and wire which are used for electrical contact applications.

These are all industrial products, which are seen by Treasury as less susceptible to money laundering and terrorist financing risks. Silver products are less vulnerable because of the relatively low value of silver (relative to all other precious metals), and Treasury will probably remove all requirements to implement AML programs for silver. All of these products are sold at premiums above pure metal value, because of value-added processing and content, and that premium would be lost if only metal value were available to a money launderer. The form of some of these products, e.g. cyanides, makes them less vulnerable to use outside of legitimate industrial operations without substantial financial loss. Furthermore, legitimate industrial operations are typically involved in a lengthy product evaluation and qualification process before any transaction occurs, which provides the kind of knowledge of a customer that is needed for AML.

Because the likelihood of this Division being used as a money laundering conduit is remote, the due diligence required will usually conform to a credit check, performed by the Division management itself, in the establishment of accounts. This will establish identity and business purpose for an Advanced Coatings Division customer.

Some Advanced Coatings Division customers return scrap metal byproducts to Metalor for refining and credit toward future purchases. Most of the time this scrap metal is easily identifiable as associated with legitimate industrial operations. However, if large quantities of unusual scrap are offered, this will require investigation.

Some of the customers of the Advanced Coatings Division will on occasion purchase refined metal from us. This is normally in the form of silver anodes that will be used for plating applications, but the purchase of unusual quantities of gold by these customers will require additional due diligence. Customers buying large quantities of gold (>$10,000/year) should be subjected to the same level of due diligence as a medium to high risk refining customer, depending upon actual quantities.

- "the nature of the dealer's customers"

An established business, reasonably known to use or deal with precious metals for legitimate purposes, is less likely to be laundering criminal proceeds through its precious metal transactions. A precious metal transaction with, say, a bullion bank such as Sovereign Bank, or a local area jewelry manufacturing company, is less vulnerable than a transaction with an individual, particularly one who is unknown and with no apparent business affiliation. Treasury

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

has clearly and strongly recognized the reduced risk of transactions with other regulated dealers in precious metals who have compliant AML programs.

- "the nature of the dealer's suppliers"

Acquisition of precious metal refining lots from local jewelry manufacturers, for example, which will regularly have scrap, should be less vulnerable than acquisition of similar refining lots from unaffiliated collectors. Again, Treasury has clearly and strongly recognized the reduced risk of transactions with other regulated dealers in precious metals who have compliant AML programs.

- "the nature of the dealer's distribution channels"

Distribution of precious metals directly to local, established jewelry manufacturers, or of London good delivery gold bars to repositories for precious metal exchanges, would be less vulnerable than distribution to individuals. Distribution at long distances and in foreign jurisdictions, where legitimate purposes may be more difficult to establish, may require more attention. Sales to brokers and distributors, rather than to end users, may require more scrutiny to assure that the end uses are legitimate.

- "the nature of the dealer's geographic locations"

There are no areas that are immune from money laundering, but there are areas where greater scrutiny for money laundering may be advisable. Metalor has an office in Los Angeles, and that city has experienced money laundering in precious metal transactions. It is classified by FinCEN as a High Intensity Financial Crime Area (HIFCA). Metalor also has a substantial business with countries in South and Central America, notably Columbia. These countries are legitimate sources of gold from very extensive mining operations, as well as from collectors, but have also experienced money laundering and fraud. The Metalor AML Program will devote additional attention to transactions that involve these areas.

While not expressed by Treasury in the AML Rule, there are other considerations that might be made within the precious metals industry:

- the value of a transaction

Individual, isolated small transactions are less likely to be used for money laundering. Treasury requires, for example, reporting of certain cash transactions that exceed $10,000, and that value could be applied to precious metal transactions as well. The international Financial Affairs Task Force recommends that a dealer in precious metals give special attention to cash transactions in excess of $15,000.[5] The Metalor AML Program will apply to all transactions, however small, but the procedure for approving a small transaction can be simplified, while still monitoring for structured transactions.

- the use of currency

---

[5] FATF 40 Recommendations, Recommendation 12, http://www1.oecd.org/fatf/40Recs_en.htm

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

A purchase or sale of precious metal with anonymous currency, or with other monetary instruments that do not adequately identify the offering party, is vulnerable. Metalor does not do business in currency, and the Metalor AML Program will not approve of any transactions in which the Company either receives or pays in cash or anonymous monetary instruments.[6]

- payments or returns to persons other than the owner

If one person delivers precious metal to Metalor for refining, and asserts ownership of the metal and authority to sell it, but directs that payment be made to another person, that transaction is vulnerable. The Metalor AML Program will prohibit the payment for metal to any person other than the owner. There are, however, legitimate transactions in which a customer's precious metal in Metalor's possession – the result of toll refining services by Metalor – will be transferred to a third party, such as a bullion bank or contract parts fabricator. The Metalor AML Program will call for the review and approval of these transactions.

These considerations can not be automatically applied to a formula to reach a result. They must be taken into consideration by the Compliance Officer, with consultation with and advice from the Compliance Committee, and who, using his or her experience in the precious metals industry and sound judgment, will make a best judgment regarding customers and transactions.

---

[6] U.S. currency is, by federal law, lawful tender for the payment of debt in the United States. 31 U.S.C. 5103. A refusal to accept cash for the payment of a debt should be stated in advance of a transaction, before the debt is established.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

## RISK ASSESSMENT SUPPLEMENT

### CARDIAC CATHETER TIPS
### EXPEDITED PROCEDURE FOR SOURCE HOSPITALS

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1)) This evaluation is intended to fulfill the requirement of a risk assessment specifically with regard to cardiac catheter tips, and to guide the implementation of Metalor's AML Program.

The Treasury regulation requires that:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> (A) The type(s) of products the dealer buys and sells, as well as the nature of supplier; and the dealer's customers, suppliers, distribution channels, and geographic locations; 31 CFR 103.140(c)(1)(i)

Metalor solicits refining business from hospitals with regard to the end tips of single-use cardiac catheters, small metal pieces that contain several grams of platinum. These catheters have all been used in medical treatment of heart conditions, and no longer have value as medical devices. They are set aside, one by one, in operating rooms, and collected. Metalor burns off any remaining plastic attached to the tips, and sends the platinum portion to its parent company in Switzerland for final refining.

There are two ways in which these catheter tips can be acquired by Metalor: directly from hospitals, or from collectors who have themselves dealt directly from hospitals. Acquisition from a hospital should be a very low risk transaction. A hospital is a legitimate generator of this type of scrap, and is readily identified because of its prominent physical presence and standing in a community. These tips are therefore not a likely vehicle for money launderers. There might be some risk of a fraudulent transaction if a waste management person working at the hospital could collect these tips privately, without upper management authority, but that risk can be avoided through a reference check with hospital accounting offices and/or HR offices, and through proper payment directions to a hospital account. Acquisition from a collector would present a somewhat higher risk, because the legitimacy of the original hospital-collector transaction would not be certain.

Transactions with hospitals should require, for AML purposes:

1. identification of the hospital,
2. an on-site observation by a Metalor representative, or a document cross-check, such as a listing in an AHA directory, to be certain that it is an operating hospital,

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

3. a letter from the hospital, on its letterhead, addressed to Metalor, referencing this business and identifying an appropriate contact person at the hospital (who may be the author of the letter),

4. a cross-check with the hospital to verify authority of the contact person, and

5. payment directions only to an account in the name of the hospital.

The Compliance Officer can authorize a hospital as an AML approved customer for this material upon satisfaction of these requirements. Any such approval should be reviewed in the normal course of business, but need not wait for such review.

Transactions with collectors should require the usual AML procedure and approval.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

## RISK ASSESSMENT SUPPLEMENT

## OVER-PRICING, UNDER-PRICING

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1))  This evaluation is intended to fulfill the requirement of a risk assessment specifically with regard to the possible manipulation of refining transactions, through over-pricing or under-pricing precious metals, by Metalor USA Refining, and to guide the implementation of Metalor's AML Program.

The Treasury regulation requires that:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> (A) The type(s) of products the dealer buys and sells, as well as the nature of supplier; and the dealer's customers, suppliers, distribution channels, and geographic locations; 31 CFR 103.140(c)(1)(i)

There is a risk that one or more Metalor employees may knowingly and intentionally engage in collaboration with outside criminals to launder the illegal assets of such outside criminals.  One way in which this might be done would be through over-pricing or under-pricing precious metal-bearing materials intended for refining and purchase by Metalor, or precious metal products intended for sale by Metalor.

This type of transaction has been recognized by the Federal Financial Institutions Examination Council in its Bank Secrecy Act Anti-Money Laundering Examination Manual:

> "[G]oods may be over- or undervalued in an effort to evade AML or customs regulations, or to move funds or value across national borders. For example, an importer may pay a large sum of money from the proceeds of an illegal activity for goods that are essentially worthless and are subsequently discarded. Alternatively, trade documents, such as invoices, may be fraudulently altered to hide the scheme. Variations on this theme include inaccurate or double invoicing, partial shipment of goods, and the use of fictitious goods. Illegal proceeds transferred in such transactions thereby appear sanitized and enter the realm of legitimate commerce." BSA/AML Examination Manual, 2007, p. 242

Metalor could, for example, pay more for a shipment of gold mining doré from Colombia than the value of the contained gold, and thereby deposit the excess money into a bank account in Colombia in what would otherwise seem to be a routine business transaction.  Likewise, Metalor could pay less than the true gold value, thereby transferring a valuable asset into its hands in the United States.  Because the value of gold is so high, relatively small false value adjustments to real transactions could be used to transfer large amounts of money.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

# RISK ASSESSMENT SUPPLEMENT

## SELL GOLD™ WEB-BASED PURCHASES

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1)) This evaluation is intended to fulfill the requirement of a risk assessment specifically with regard to the Sell Gold™ web-based purchases of scrap jewelry by Metalor USA Refining, and to guide the implementation of Metalor's AML Program.

The Treasury regulation requires that:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> (A) The type(s) of products the dealer buys and sells, as well as the nature of supplier; and the dealer's customers, suppliers, distribution channels, and geographic locations; 31 CFR 103.140(c)(1)(i)

Metalor has created a website – www.sell-gold.com – at which it solicits people to sell unwanted jewelry to Metalor for its precious metal value. The transaction begins with the customer filling in a form on the website, providing a description of the jewelry to be provided to Metalor, and his or her name, address, telephone number and email address. This form is submitted directly on the web site. The customer then prints out a mailing label from the website, attaches it to a package containing the jewelry, and sends the package to Metalor at the North Attleboro refinery location. Metalor receives the package, examines the jewelry, weighs and assays (x-ray) it, and sends a check to the customer, payable to the name given, mailed to the address given. If the customer disagrees with the amount, he or she is to notify Metalor within ten days and return the check, and Metalor will return the jewelry. Metalor keeps the jewelry separate and identifiable for 14 days in anticipation of possible rejection by a customer.

The primary AML vulnerability of this procedure is that the identity of the seller is not verified to Metalor through a current government-issued photo identification document, such as a driver's license. Safeguards associated with this procedure, on the other hand, are that the customer must be self-identified by name and address - these are mandatory fields in the initial web-site submission – and payment by Metalor will be by check payable to that named person, mailed to that name at that address. That check, in turn, will need to be cashed at another financial institution.

The records of these transactions are maintained by the web site administrator, and can be accessed and downloaded by Metalor. These include the original information provided by the customer, and the additional information that is determined by Metalor on receipt and inspection of the received jewelry. So each transaction will be relatively well documented, and can be retrieved through electronic search. The SAP database will contain some transaction data, including each payment, but will not identify each customer.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

**Metalor Technologies USA – AML Policy and Program**

The web site is intended to deal in relatively small transactions. The risk of money laundering and/or terrorist finance is accordingly low. But there are no stated limits to the number and size of transactions. The site contains the following message in its "Education" page:

> If you are considering sending a large amount of unwanted jewelry to Sell Gold™ please be aware that we may require additional personal information from you such as your Social Security Number. Large payments must be reported to the IRS by Sell Gold™.

A "large amount of unwanted jewelry" should be defined (not necessarily on the website) as $5000, for any one or more transactions involving the same customer or the same mailing address. This amount - $5000 – is the level at which a bank must be attentive to suspicious activity, and it is a reasonable level for Metalor to require additional customer information.

The AML Compliance Officer should periodically inquire of Metalor Customer Service employees who administer the program if there have been unusual events, large transactions, multiple transactions from a single customer or family name, or from the same address. Large amounts of activity through the website, particularly from a single geographical area, may warrant additional attention.

Metalor USA Refining inside customer service employees must be trained in the application of the AML Program to this operation.

Overall, this program should be low risk for AML purposes, as long as it is monitored.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

The value of any refining transaction is based upon the weight of material, its precious metal assay, and the contemporaneous market prices of the contained precious metals. A shipment of gold mining doré with a weight of 100 troy ounces and an assay of 0.900, at a time when the price of gold is $600 per troy ounce, has a contained value of $54,000. One or more of these three factors would have to be falsified for any over-pricing or under-pricing to work. The Metalor Controller has said that there are a number of cross checks and separate steps that would be necessary in any transaction, so that a substantial number of people would have to be involved. There are frequent checks of metal content in shipments, both as to weight and assay, by different people in different departments, and the market value of gold is referenced twice daily according to international markets. Discrepancies of any of these factors from one step to another would be noted, from initial weighing upon receipt to final process weight. Payment to any customer then requires a direction with a document from refining or trading that supports the payment, and at least two people in accounting to authorize payment. The Metalor Controller believes that it would be extremely difficult to involve so many people in a conspiracy.

Outside accountants Kieliszak, Eggert & Company, Ltd., Certified Public Accountants, discussed the risk at some length. The SAP database system keeps track of data and checks and balances, and there are automated comparisons to detect discrepancies and changes that would be unexpected. Metalor security routinely checks for assay accuracy in blind tests. These outside accountants agreed that a number of people from different positions within Metalor would have to be involved, perhaps six or more, from the shop floor to management. Any distortion of weight or assay would, even if initially successful, not survive the eventual bi-annual inventory checks.

This information conforms to my observations of the separation of process, trading, refining and accounting functions, the thorough documentation, and the seemingly constant cross checking of transactions. I conclude that the risk of money laundering through knowing manipulation of Metalor refining transactions – manipulation of weights, assays and/or prevailing market prices, and consequent over-pricing or under-pricing of precious metals – is very low. I am satisfied that the accounting and security systems are adequate to protect against such manipulation.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

## RISK ASSESSMENT SUPPLEMENT

## DELIVERY TO THIRD PARTIES

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1))

This Risk Assessment Supplement considers the degree of risk and the degree of further AML investigation and approval that should be performed upon customers of Metalor customers to which direct gold deliveries are made by Metalor. For example, Metalor has been asked by banks to deliver gold directly to their borrowers of gold. The banks have received Metalor AML approval, but their customers – who are not legally customers of Metalor - have not.

The basic risk is that Metalor's delivery of gold will be diverted to criminal purposes, and that risk is not particularly different from Metalor's delivery of gold to direct customers. However that basic risk is inherently lower for direct customers, because Metalor knows its customers, at least to some degree, through the business relationship. The Treasury regulation governing AML Programs for dealers in precious metals makes a clear distinction between "established customers" and other customers:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> …
> (B) The extent to which the dealer engages in transactions other than with established customers or sources of supply, or other dealers subject to this rule;
> 31 CFR 103.140(c)(1)(i)

An "established customer" is defined in anti-money laundering regulations as follows:

> (l) Established customer. A person with an account with the financial institution, including a loan account or deposit or other asset account, or a person with respect to which the financial institution has obtained and maintains on file the person's name and address, as well as taxpayer identification number (e.g., social security or employer identification number) or, if none, alien identification number or passport number and country of issuance, and to which the financial institution provides financial services relying on that information.
> 31 CFR 103.11(l)

Direct customers of Metalor, such as banks described above, are established customers of Metalor. They are also likely to be dealers in precious metals subject to the AML Rule, the other factor that Treasury sees as reducing risk. These factors can thus be taken into consideration as reducing the risk of money laundering in our direct transactions.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

But customers of customers are not – by definition – established customers of Metalor. And they may or may not themselves be subject to the AML Rule for Dealers in Precious Metals. Some persons to whom Metalor is requested to deliver gold may not be residents of the United States, and therefore may not be subject to the AML Rule. Others may not be dealers in precious metals under the definitions of the AML Rule. Therefore Metalor can not assign a lower risk to deliveries to third parties under "established customer" and "dealers subject to this rule" considerations.

On the other hand, if direct customers of Metalor are themselves subject to the AML Rule, they will have investigated and approved their customers – according to the standards of their AML Programs. Written certification to Metalor of this outside AML approval can provide some assurance and comfort to Metalor, particularly with regard to customers of banks.

But an outside AML approval can not satisfy Metalor's obligation to perform AML due diligence with regard to its own transactions. Accordingly, when Metalor delivers gold, it is necessary that Metalor go beyond its relationship with its direct customers to further investigate and approve third party customers under the AML Program.

Therefore, as a general AML Program rule (see exceptions below), Metalor will, upon direction of a Metalor customer, deliver gold to a third party only upon Metalor AML Program approval of that third party. The same procedures and standards will be applied to third parties as to Metalor direct customers, with the exception that business reference and credit information is generally less important, because the third parties have already established business relationships with Metalor direct customers. Therefore the primary due diligence of third parties will be identification and investigation of lists of persons of concern, and check against other sources of information about potential criminal involvement.

Transactions involving third parties will be monitored in the same manner as other transactions, and suspicious activities will be investigated, with the possible Metalor action of subsequent termination of deliveries.

Exceptions:

A. Temporary Approval During AML Due Diligence

In the absence of suspicious circumstances, Metalor will temporarily, for a period not longer than thirty days (unless a specific exception is made by the AML Compliance Officer), deliver gold to a third party while AML due diligence is underway, under the following conditions:

    1.    The direct Metalor customer has been approved under the Metalor AML Program, and has certified that it is in compliance with the AML Rule for Dealers in Precious Metals, 31 CFR 103.40, using Metalor AML Compliance Certification Form (annexed);

    2.    The direct Metalor customer identifies its third party customer, including name, business address and contact person, and certifies that its third party customer has been

**This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.**
© Metalor Technologies USA, 2007, all rights reserved

approved under the AML program of the Metalor customer, using Metalor AML Approval Certification Form (annexed);

## B. United States Delivery of Toll-Refined Gold

Metalor will, upon direction of a Metalor refining customer that has provided gold to Metalor for refining, deliver that customer's fine gold output to a third party within the United States upon compliance with the following conditions:

1.    The Metalor refining customer has been approved under the Metalor AML Program, and has certified that it is in compliance with the AML Rule for Dealers in Precious Metals, 31 CFR 103.40, using Metalor AML Compliance Certification Form (annexed);

2.    The Metalor refining customer identifies its third party customer, including name, business address and contact person, and certifies that its third party customer has been approved under the AML program of the Metalor customer, using Metalor AML Approval Certification Form (annexed);

## C. Third Party Drop Shipments – Advanced Coatings Division

Metalor Technologies Advanced Coatings Division sells products in some cases to distributors, who then sell to their own customer electroplating companies. Metalor is sometimes asked by distributors to ship directly to their customers. In general, the risk of money laundering through electroplating chemicals, such as potassium gold cyanide, is relatively low, because the market for them is highly specialized and they are not readily exchanged for money or other valuable items.

Metalor Technologies Advanced Coating Division will, upon direction of a customer, deliver electroplating chemicals to a third party upon compliance with the following conditions:

1.    The Metalor Technologies Advanced Coatings Division customer has been approved under the Metalor AML Program, and has certified that it is in compliance with the AML Rule for Dealers in Precious Metals, 31 CFR 103.40, using Metalor AML Compliance Certification Form (annexed);

2.    The Metalor Technologies Advanced Coatings Division customer identifies its third party customer, including name, business address and contact person, and certifies that its third party customer has been approved under the AML program of the Metalor customer, using Metalor AML Approval Certification Form (annexed);

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

# METALOR TECHNOLOGIES USA
# AML COMPLIANCE CERTIFICATION

· Certification of Customer AML Regulatory Status
Regulated or Non-Regulated Dealer in Precious Metals

The United States government has asked every dealer in precious metals to determine if its customers are also dealers in precious metals, and, if so, are in compliance with the AML Rule. Accordingly we seek the following certification from you.

The undersigned certifies that _____
                                                Name of Customer

(please mark one)

_____ is a "dealer in precious metals" under United States law, and is in compliance with the requirement of 31 CFR 103.140 to develop and implement an anti-money laundering program.

_____ is not subject to the requirement of 31 CFR 103.140 to develop and implement an anti-money laundering program for dealers in precious metals.

Date: _____       Signature: _____

                                              Name: _____
                                              Title: _____

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

# METALOR TECHNOLOGIES USA
## AML APPROVAL CERTIFICATION

Certification by Metalor Customer of Third Party AML Approval

The undersigned, on behalf of _____, hereby certifies:

Name of Metalor Customer

1. The Metalor Customer named above requests that Metalor deliver gold to a third party:

_____

Name

_____

Address – Line 1

_____

Address – Line 2

_____

City

_____

State / Country

_____

Postal Code

_____

Individual to Contact

_____

Telephone

2. This third party has been approved for this transaction pursuant to the AML Program of the named Metalor Customer in compliance with the requirements of 31 CFR 103.140.

Date: _____    Signature: _____

Name: _____
Title: _____

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

## RISK ASSESSMENT SUPPLEMENT

## GOLD FROM FOREIGN SOURCES

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1)) This evaluation is intended to fulfill the requirement of a risk assessment specifically with regard to third party pickup and drop shipments of Metalor products, and to guide the implementation of Metalor's AML Program.

The Treasury regulation requires that:

> For purposes of making the risk assessment required by paragraph (c)(1)of this section, a dealer shall take into account all relevant factors including, but not limited to:
> (A) The type(s) of products the dealer buys and sells, as well as the nature of supplier; and the dealer's customers, suppliers, distribution channels, and geographic locations;
> (B) The extent to which the dealer engages in transactions other than with established customers or sources of supply, or other dealers subject to this rule; and
> (C) Whether the dealer engages in transactions for which payment or account reconciliation is routed to or from accounts located in jurisdictions that have been identified by the Department of State as a sponsor of international terrorism under 22 U.S.C. 2371; designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member and with which designation the United States representative or organization concurs; or designated by the Secretary of the Treasury pursuant to 31 U.S.C. 5318A as warranting special measures due to money laundering concerns.

31 CFR 103.140(c)(1)(i)

Gold from Foreign Sources

Metalor USA Refining has been approached on numerous occasions with proposals to refine gold asserted to be from other countries, most frequently in recent times from Africa. Some of these proposals have come through intermediate refiners in the United States, already customers of Metalor, who have themselves been approached by prospective customers who claim to have access or sources of gold in Africa. The usual claim is that the gold has been mined from alluvial deposits by artisan miners. All, or almost all, of these proposals come from persons with no known connection to precious metals industries, in Africa or anywhere else, no knowledge of how the gold market works, and no experience.

It is highly likely that these proposals are false. It may be that the person actually making the proposal to Metalor is completely unaware of this, but has been deceived by another person's proposal, but the underlying proposal is at very high risk of being a fraud.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

In addition to this risk, Metalor USA does not have the resources and expertise to properly investigate and monitor a source in most other countries, including countries in Africa, in a way that satisfies the standards of our AML Program. For comparison, it has been our practice with potential customers in Mexico, Central America, Colombia and Peru, where we are more established, to evaluate them as we would a potential customer in the United States – i.e., to send a company representative to visit the premises of a proposed customer and evaluate its operations and their consistency with its proposed refining transactions. We also directly employ persons in Peru with experience in the precious metals mining business who assist us in evaluating proposals from well-established mining enterprises, and in local evaluation of mine product before shipment to the United States. We do not have the resources or expertise to take these steps in most other countries, including all of the countries in Africa.

Accordingly it will be the procedure of Metalor, when we receive a proposal that involves precious metal from a country other than the United States, to first obtain only a short narrative description of the proposal, without initiating the AML procedure. The short narrative should be promptly forwarded to the AML Compliance Officer, and should include:

1.     The name and contact information of the proposed customer. No verification is needed at this stage.
2.     A brief description of the source of the precious metal involved in the proposal, e.g., alluvial miners in Ghana.
3.     A brief description of the logistics of the proposal, e.g., weekly shipments of 10 kg of alluvial gold, Accra to New York by plane, armored carrier to North Attleboro.

The AML Compliance Officer will promptly review this narrative description with Refining Customer Service and will promptly determine if there is any rational basis for going forward with the AML procedure.

Proposals involving Central and South America will be more likely to go forward, because of our experience and resources there. Proposals involving other areas are not likely to be approved, but approval is possible. If, for example, we are approached by a major international mining company, such as Anglogold Ashanti, we will proceed to evaluate that proposal for AML compliance. But in the great majority of cases, there will be no further attention given to the proposal. The AML Compliance Officer will respond to the proposed customer declining the proposal.

Metalor Technologies S.A. in Switzerland has the resources and expertise to evaluate proposals that involve Africa, and has expressed an interest in receiving these proposals, albeit with similar skepticism. Accordingly the AML Compliance Officer will provide contact information regarding our Swiss refinery to persons making such proposals.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

## RISK ASSESSMENT SUPPLEMENT

## CUSTOMER BUSINESS LEVEL VOLATILITY

The United States Department of the Treasury requires that a dealer in precious metals create and implement an anti-money laundering program that is "based upon the dealer's assessment of the money laundering and terrorist financing risks associated with its line(s) of business." (31 CFR 103.140 (c)(1))  Treasury further states that "[f]actors that may indicate a transaction is designed to involve use of the dealer to facilitate money laundering or terrorist financing include, but are not limited to:

…

> (D) Purchases or sales that are unusual for the particular customer or supplier, or type of customer or supplier

"Purchases or sales that are unusual" include different types of materials, such as a manufacturer of gold jewelry shipping a batch of platinum for refining.  And it will include, to some degree, shipments of the same materials but at higher volumes.  But finding an unusual amount of material requires an understanding of that an "unusual" level of business in the gold refining industry is difficult to determine.  There are a number of factors that can lead to shipments that are irregular, and may appear to be "unusual", but are not.

There is a great deal of competition among gold refiners, and all refiners work to gain and maintain market shares.  This competition is worldwide, and transport costs of high grade gold material are a small fraction of value, so, for example, a refinery in Switzerland is in active competition for some customers with a refinery in the United States.  Customers sometimes respond to this competition by changing refiners, cutting shipments completely from one refiner or starting at a full level with another.  Even if customers do not completely change refiners, they may sometimes split their materials between two refiners and thus effectively cut their shipments to one refiner in half.  Or customers may change from two refiners to one, and thus effectively double their shipments to one refiner.

The world market price of gold is volatile, and when it moves significantly there will be increased or decreased volumes of gold to be refined.  A higher price will induce more people to mine gold, and to sell their scrap gold, such as old jewelry.  A lower price will have a somewhat limiting effect on mining and on the sale of old jewelry.

Manufacturers typically have product cycles, and manufacturing of gold jewelry may increase, for example, to meet Christmas shopping demand.  They also typically have a regular cleanup/inventory period when larger amounts of manufacturing scrap will be collected and shipped for refining.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

Metalor Technologies USA – AML Policy and Program

A refining customer may be aggressively increasing its own market share.  For example, a collector of scrap gold jewelry may aggressively pursue smaller collectors and pawn shops, offering better terms, and may take business away from another customer.  The gold refiner of the aggressive collector will see a rise in business; the refiner of the less aggressive collector will see a decline.

A refining customer may also accelerate or delay shipments to a refiner.  A customer who believes that the price of gold is rising may temporarily hold back a shipment.  Conversely a customer who believes that the price of gold is falling may accelerate a shipment.  While the time difference is not likely to be large either way, it might shift a shipment into another accounting period, such as a week or month.  Or a logistical problem might delay a shipment from one accounting period to another.

For all of these reasons, the level of business which might be "unusual" can not be stated as a simple, reliable percentage above a steady, regular level of business.  A review of more than two and a half years (January 2005 – August 2007) of high grade gold shipments from eighteen customers in the Los Angeles area shows that there is no such thing as a "regular" weekly shipment.  No customer ships every week; the most consistent customer shipped to Metalor in 86% of these weeks; the least consistent in 6%.  When customers do ship, the maximum amount has been as high as thirty-eight times the minimum shipment from the same customer.  The average maximum shipment for these eighteen customers was more that twice the average average shipment and seven times the average minimum shipment.

This is not to ignore changes in levels of customer business.  Metalor will continue to examine changes, especially looking for large changes in large accounts, and will make further inquiry where it is concerned.  But fairly significant  changes from week to week, and year to year, are not necessarily indications that something unusual has happened in a customer's business.

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved

## CUSTOMER APPROVAL PROCESS

The customer approval process has two goals. Metalor must know the identity of its customer, and must know that the customer has a legitimate business reason for engaging in a proposed transaction. This section of the Metalor AML Policy and Program is intended to establish general due diligence requirements for customer approval, based upon these two goals, upon the risk criteria set forth in the Metalor AML Program Risk Assessment, set forth above, and upon the experience and informed judgment of the AML Compliance Officer in evaluating and approving customers.

A.    New Customer Approval Process

The following procedure will be used for approval of new and existing refining customers. A proposed new customer will be provided with the Metalor Customer Information Form (Annex 1) , requesting certain information regarding identity, contacts, business operations and references, and a certification that the proposed customer is in compliance with the AML Rule for Dealers in Precious Metals, or is exempt or not covered by that rule. This information form must be completed and provided to the AML Compliance Officer. The sales representative who is sponsoring the customer for acceptance may assist the customer to gather such relevant customer information as is reasonable. The AML Compliance Officer will provide direction and assistance in this collection process, where appropriate.

The AML Compliance Officer may, but is not required to, require that customer-supplied documents (such as copies of passports, Articles of Incorporation, etc.) be certified or otherwise authenticated.

The AML Compliance Officer will consult other sources of information, such as industry directories and corporate reviews, credit rating agency reports, and government watch lists for additional information.

The sales representative and/or AML Compliance Officer should, whenever possible, conduct site visits to customer facilities at which precious metals will be generated or used or take any other appropriate measures to obtain additional information, and should provide a narrative description of the customer's business as so observed.

The types and amounts of customer information that is needed will vary from case to case. A proposed transaction regarding, for example, spent sputtering targets, with a publicly traded corporation in the United States that is a known user of precious metals, e.g. IBM, will require substantially less due diligence than (1) a customer or account located in or doing business in high money-laundering risk regions, such as a country designated by FinCEN or the FATF as of concern or uncooperative; (2) a customer who will deal in higher value product; and (3) a customer in non-established channels of business. The decision regarding what and how much information to permit approval will be a matter of judgment for the AML Compliance Officer.

When the AML Compliance Officer has, in his or her judgment, adequately collected sufficient information, the decision to approve or not approve will be made by the AML Compliance

**This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.**
**© Metalor Technologies USA, 2007, all rights reserved**

**Metalor Technologies USA – AML Policy and Program**

Officer, and he or she will direct IT to create a customer record that will permit transactions to proceed.

In addition to the types of information that may be required during the new customer approval procedure, the AML Compliance Officer, and any other involved persons, such as a salesperson, will be attentive for indications of additional concern and risk, "red flags" such as, but not limited to, the following:

- The customer exhibits unusual concern regarding Metalor's compliance with government reporting requirements and Metalor's AML Policy, Program and Procedures, particularly with respect to his or her identity, type of business and assets.
- The customer is reluctant or refuses to reveal any information concerning business activities, or furnished unusual or suspect identification or business documents..
- The customer wishes to engage in transactions that lack business sense or are inconsistent with the customer's stated business strategy.
- The information provided by the customer that identifies a legitimate source of funds is false, misleading or substantially incorrect.
- Upon request, the customer refused to identify or fails to indicate any legitimate source for his or her funds and other assets.
- The customer (or a person publicly associated with the customer) has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations.
- The customer exhibits a lack of concern regarding risks, commissions, or other transaction costs.
- The customer appears to be acting as an agent for an undisclosed principal, but declines or is reluctant, without legitimate commercial reasons, to provide information or is otherwise evasive regarding that person or entity.
- The customer has difficulty describing the nature of his or her business or lacks general knowledge of his or her industry.
- The customer wishes to make frequent or large deposits of currency, insists on dealing only in cash equivalents, or asks for exemptions from the Company's policies relating to the deposit of cash and cash equivalents.
- For no apparent reason, the customer wishes to have multiple accounts under a single name or a single account under multiple names, with a large number of inter-account or third party transfers.
- The customer wishes to maintain accounts in the names of family members or corporate entities, for no apparent business.

B.    Expedited Interim Approval Process for Refining Customers

There are circumstances in which a proposed new customer desires to promptly begin transactions with Metalor. This is very common and understandable, because it promotes cash flow and reduces the risk of market volatility in precious metals. In many circumstances such a customer has been pursued by Metalor for a significant amount of time, perhaps years, and the customer is well known, both as to identity and legitimacy, and the risk of money laundering is low. In such circumstances, the following procedure may be used for preliminary or interim

**This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.**
**© Metalor Technologies USA, 2007, all rights reserved**

approval of low risk transactions.  The AML Compliance Officer may temporarily approve a customer for a particular low-risk transaction, subject to prompt initiation and subsequent completion of the normal customer approval process.

The following information should be required and put into the computer transaction database in such circumstances:

> Customer business name (letterhead acceptable);
> Business address;
> Telephone;
> Fax;
> Identification of customer representative;
> Authority of representative (oral description)
> Nature of business and purpose for transaction (oral description).

Such approval must be attentive to the possibility of an attempted fraud by a person with no actual relationship to such a known company, so it must be checked for that possibility, but that check can be done informally and efficiently.  Such a customer must, as with all customers, be monitored for changes in transactions that might raise suspicion and concern.

C.      Metalor Fabricated Value-Added Products Customer Approval Process

Metalor manufactures a number of products in its Advanced Coatings Division that are of a form or type, e.g. cyanide salts, that have a limited specialized market and that are not readily converted back into money or some other asset.  These products also are sold with a higher price than their contained metal, to reflect the added fabrication value, but that fabrication has value only to persons who would use the specific product for its intended purpose.  A person who wanted to use these products to launder money would have to be directly involved in an industry that would pay full price, or would sacrifice a substantial amount of the value by reducing these products to scrap, and then paying a substantial refining fee to recover their contained metal value.

Metalor Advanced Coatings Division engages in due diligence for buyers of these fabricated value-added products through credit checks, which provide sound identification and bank and trade references.  In addition, almost all potential customers require a lengthy qualification period, to be sure that the Metalor product meets their needs, and Metalor becomes familiar with the intended legitimate use of its product.  Accordingly, there is not a need for additional intensive due diligence by the AML Compliance Officer to review and approve a customer account.

A proposed new account with a company that intends to purchase a Metalor fabricated value-added product may be approved by management of the Advanced Materials Division, with notification to the AML Compliance Officer.  The following information should be required and put into the computer transaction database in such circumstances:

> Customer business name (letterhead acceptable);

This document is CONFIDENTIAL and access is restricted to Metalor Technologies USA and designees.
© Metalor Technologies USA, 2007, all rights reserved