

**AFFILIATED**
MONITORS, INC.™

Local 617 275-0620
Toll Free 866 201-0903
Fax 617 345-0102
58 Batterymarch Street, #114
Boston, Massachusetts 02110

Vincent L. DiCianni
E-mail: vdicianni@affiliatedmonitors.com

April 10, 2008

Bruce Foucart
Special Agent in Charge
US Immigration and Customs Enforcement
Suite 722
10 Causeway Street
Boston, MA 02222

RE:    Metalor USA Refining Corporation AML Policy and Program Audit Monitoring Report
       for the Period of October 1, 2007 through December 31, 2007

Dear Special Agent Foucart:

I am enclosing the Monitoring Report for Metalor USA Refining Corporation for the Fourth Quarter of 2007. The report is being submitted pursuant to the Remedial Measures section of the Plea Agreement entered into by Metalor on January 8, 2004.

We will be conducting the audit for the First Quarter at the end of April and will submit our report shortly thereafter.

Please contact us if we can provide additional information.

Very truly yours,

Vincent L. DiCianni

Enclosure

cc:    Steve Crogan
       David Ryan, Esquire

## NINTH QUARTERLY MONITORING REPORT BY
## AFFILIATED MONITORS, INC.
## FOR THE THREE MONTH PERIOD FROM
## OCTOBER 1, 2007 THROUGH DECEMBER 31, 2007

### METALOR USA REFINING CORPORATION

### INTRODUCTION

Affiliated Monitors, Inc submits this report of the Compliance related activities of

Metalor USA Refining Corporation ("Metalor") pursuant to the Plea Agreement entered

into with the United State's Attorney's Office for the District of Massachusetts, dated

December 23, 2003. Affiliated Monitors submits this quarterly monitoring report for the

time period of October 1, 2007 through December 31, 2007. This is the tenth report

submitted by Affiliated Monitors since it has assumed the duties of monitoring Metalor's

compliance activities for the United States Attorney's Office and the United States

Immigration and Customs Enforcement Department ("Customs").

This report will provide a review of compliance activities of Metalor for the Fourth

Quarter of 2007. This report addresses the activities of Metalor's New Compliance

Officer, Steve Crogan, as well as those of Metalor's Internal Monitor, John Bullock. In

this report, we also address the specific application of Metalor's AML program and its

adherence to the terms of the Plea Agreement.

### METHODOLOGY OF THIS REPORT

As we have since we have been serving as the independent auditor under the

Plea Agreement, the audit activities of Affiliated Monitors in conducting the audit for the

Fourth Quarter of 2007 included an independent review of Metalor's Compliance related

activities for the time period as well as developing additional information about the

1

activities of Steve Crogan, Metalor's Compliance Officer and the on-going transition by Metalor for Mr. Crogan to hold the positions as the Compliance Officer and Director of Security under the AML program.

Specifically, the audit activities including the following:

- Interviews with Kenneth Beilstein, the General Manager of Metalor, J Stephen Crogan Metalor's Compliance Officer and Director of Security and John Bullock, Metalor's Internal Monitor on March 5, 2008;

- A review of the records, reports and correspondence files of the Compliance Officer compiled during the fourth quarter of 2007;

- Continuing review of any open items addressed in the Report for the Third Quarter and earlier reports;

- A review of the reports prepared by Metalor's Internal Monitor including his reviews of data generated by Metalor's IT department concerning, among other analysis, business trends through customer activities throughout the quarter, changes in status of customers banking and business activities and related information.

- Reviews of the files of the Compliance Officer including new customer due diligence files, suspicious activity files, wire transfer files and files as they were created during the quarter;

- Information about Metalor's Training efforts during the Fourth Quarter of 2007;

- A review of the minutes of the Compliance Committee for the meetings of October 10, 2007, November 6, 2007 and December 4, 2007;

2

- Consideration of Metalor's efforts to address the recommendations previously made by Affiliated Monitors;

- Ongoing observations of the transition of the AML program by Metalor through change in Compliance Officer and in the combining of the positions of Director of Security and Compliance Officer.

On March 5, 2008, AMI's designated monitor, Dennis Kelleher met with Kenneth Beilstein, Metalor USA's General Manager, Steve Crogan, Metalor's Compliance Officer and Director of Security and John Bullock, who now serves as Metalor's Internal Monitor, as part of the audit of the Metalor's AML program for the Fourth Quarter.

Prior to that meeting, AMI was provided with copies of the records compiled by Mr. Crogan during the Fourth Quarter, minutes of the Compliance Committee meetings in October, November and December, 2007, as well as the Reports generated by Mr. Bullock for each month during the quarter.

As we have noted previously, Metalor continues to be fully cooperative throughout the monitoring process as they have been since Affiliated Monitors assumed the role of independent monitor.  Metalor's representatives were open and frank in their responses to the questions posed in our interviews and have been forthcoming with all requested data, documentation and information.

For new customers, Metalor continues to conduct due diligence through the efforts of the Compliance Officer/ Director of Security as well as its staff in the field. Mr. Crogan's due diligence effort looks at date provided in the field about the potential customer, the corporate status of the customer and some history about the potential new customer and perhaps previous dealings with Metalor.  In addition, the company

3

provides additional information through documents and data supplied in response to a questionnaire posed by Metalor, which includes questions about the background of the company and its operatives and the reasons why it is seeking to do business with Metalor. Mr. Crogan also develops information from various sources including government and informational databases as well as the network information developed by the Compliance Officer. Our review of those New Customers accepted by Metalor for the months of October, November and December 2007 is detailed in Section 8 below.

As we have reported in our earlier reports, as part of the due diligence efforts involving international customers, Mr. Crogan continues to include visiting new and existing customers and gathering information from U.S. Embassy visits, as well as expanding relationships with ICE, DEA as well as other national and international sources.

As we noted in the report for the Second and Third Quarters, the files of the Compliance Officer, particularly for new customers, due diligence and wire transfer changes appear to be better organized and contain more detailed information from the previous Director of Security, as to the depth of the due diligence being conducted.

We make one final introductory note related to Metalor's ongoing business. With the significant increase in the price of gold, Mr. Crogan anticipates that business activities will increase in high-risk areas, which will require even greater due diligence efforts and vigilance by Metalor USA. He is also being asked to expand his role with Metalor Switzerland in its due diligence efforts. Given the dual roles he is playing at Metalor USA as the Compliance Officer and Director of Security and his efforts for

4

Metalor Switzerland, it is important that the requirements placed on one person, not be overextended.

The following report details the results of the audit conducted by AMI in its review of the operations of the AML program as implemented by Metalor during the Fourth Quarter of 2007.

## 1.    OPEN MATTERS FROM PREVIOUS REPORT

Express Gold Refining: As we reported in the report for the second quarter, there have been ongoing communications between Mr. Crogan and Ice concerning this company and a possible money laundering matter being investigated by the Royal Canadian Mounted Police. Express Gold was presented for due diligence review by Mr. Crogan in April, 2007. We understand from speaking with the Mr. Bullock and Mr. Crogan that Mr. Crogan has kept ICE apprised of the developments in his investigation but there have been no developments since the report of the second quarter. According to Mr. Crogan's due diligence file on Express Gold Refining, temporary approval as a customer was given by Metalor on September 8, 2007; however, Express Gold is not listed on the New Customers accepted by Metalor according to the Database report from Mr. Bullock. According to Mr. Crogan there is nothing additional to report for the Fourth Quarter of 2007.

C.I. Fundicion Escobar: We have addressed Metalor's dealings with the company in the reports for the each quarter of 2007. Metalor has not shipped any refining materials to Metalor since January 2007, when Metalor Switzerland had taken over the gold refining business out of Peru from Metalor USA. We understand that the decision to due a business decision by Metalor Switzerland involving credit lines

available to Switzerland and not to Metalor USA at the time and that Metalor Switzerland wanted the refining business. We address this, now former customer in the section of the report detailing Mr. Crogan's due diligence efforts for Metalor Switzerland, below.

Compania Minera Santa Rosa and Cia Minera San Simon S.A., Peru. As with C.I. Fundicion Escobar, Metalor USA has ceased doing business with this company during the past year. We understand from speaking with Mr. Crogan that based upon information developed Metalor Switzerland has ceased doing business with these customers as of December 2007. We have not been provided any information from Metalor Switzerland to independently verify that this in fact has occurred but have no reason to dispute the information provided by Mr. Crogan.

Other Metalor Switzerland Customers Originating in Peru: We must correct our statement in our previous report that Metalor Switzerland was not doing business with any customers in Peru. Mr. Crogan pointed out to us that while it was correctly reported that Metalor Switzerland was not doing business any longer with C.I. Fundicion Escobar or Compania Minera Santa Rosa and Cia Minera San Simon S.A., Peru, it has continued its business relationships with other customers from Peru.

Manhattan Gold (See Suspicious Activity Report below)

We reported our submission for the second quarter that Metalor had received a grand jury subpoena in a matter involving Manhattan Gold and has responded to the subpoena as requested. We understand that Metalor is not the target of the investigation. We are also aware that ICE has been kept appraised of this matter. No additional information about this matter has been brought to our attention.

Precious Metals Exchange Group (See Suspicious Activity Report Below).

Both Mr. Crogan and Mr. Bullock, in their respective roles, continue to monitor and pay close attention to the business activities of PMXG.

## 2.    MATTERS BROUGHT TO OUT ATTENTION DURING THE THIRD QUARTER

Canadian Jewelers Sting

As reported in the previous reports, in July, 2007, Revenue Quebec made nine arrests of Toronto- Montreal based jewelers.  According to information provided to Mr. Crogan, the action focused on jewelers and scrap metal collectors who had established shell companies to reclaim taxes for sales to Canadian refiners. Mr. Crogan had communications with the Toronto Police about the investigation.  The investigation is ongoing and no new information was developed during the Fourth Quarter.

Federal Commercial Metals – Montreal

Based upon the information about the Sting Operation noted above, Mr. Crogan made inquiries about this company, which had been approved as a customer of Metalor USA in 2005, and it's principal to determine if there was any connection to the Sting. Authorization was withdrawn by Metalor.

## 3.    THE EXPANDING ROLL OF THE NEW COMPLIANCE OFFICER

As detailed in our report for the Second and Third Quarters of 2007, as of September 1, 2007, Steve Crogan replaced John Bullock as Metalor's designated Compliance Officer.  For the audit of the Fourth Quarter, which includes the first month on Mr. Crogan's first month as the Compliance Officer, the transition, as planned and implemented by Metalor has transitioned smoothly.  Mr. Crogan continues his efforts in conducting due diligence for new and ongoing customers.  There has been no reduction

in nor is there any alteration to Metalor's AML compliance related efforts that we have noticed.  In addition, Mr. Bullock, as Metalor's Internal Monitor, continues to prepare monthly reports from his Database review.

In addition, our review of Metalor files has demonstrated increased due diligence by Metalor in the sites visited by its sales representatives, the reviews of data bases by the Compliance Officer, interviews of new customer operators, by the Compliance Officer, site visits of certain potential new customers by Mr. Crogan, contacts with references provided by new customers and with the expanded contact of governmental agencies as noted above.  This additional documentation was undertaken as part of Mr. Crogan's trip to Columbia, and, as we discuss below, it provides an excellent record of dates, times and substance of communications.   As the outside auditor reviewing these activities, such additional documentation of the actual meetings and communications with these various government officials and representatives of customers provides greater depth to specific interactions with these entities and would not limit our efforts to a recitation of the interactions by Mr. Crogan.

Finally, we note that Mr. Crogan has reported that his communications with ICE and DHS during the Fourth Quarter increased in frequency regarding matters of mutual interest and Mr. Crogan has taken on an advisory role with the Trade Transparency Unit.  We also note that Mr. Crogan has conducted a training seminar for the TTU during the First Quarter of 2008.

8

**Metalor's Customer Certification program under the HSBC program:**

Mr. Crogan reports that the certifications of all third parties under the program have been completed. Most of these entities have certified that they are not subject to the U.S. AML regulations.

**Compliance Committee Status:**

During the Fourth Quarter, the Compliance Committee met on three occasions. There was no change in the composition of the committee during this quarter. We note that Mr. Beilstein attended the October meeting of the Committee.

**Dealings with Foreign Governments:**

As Mr. Crogan continues his efforts as communicating with both federal and state officials as well as with foreign officials as part of his ongoing due diligence efforts with new customers, existing customers and in the due diligence he has been conducting on behalf of Metalor Switzerland. Most of the trips that he has made have been to what are viewed as high-risk areas. We will detail the trips and contacts of Mr. Crogan throughout this report but again note that reports of such communications provide an excellent opportunity to document the specific conversations and developments during such meetings and provide the basis for any follow up activities which might have arise during or as a result of such meetings.

4.    **METALOR'S RESPONSE TO AFFILIATED MONITOR'S PREVIOUS RECOMMENDATIONS**

Occasionally throughout AMI's involvement as the independent auditor, we have made recommendations to improve both the effectiveness and efficiency of Metalor's AML program. Many of the recommendations have either been adopted by Metalor through the activities of the Compliance Officer and Director of Security or through

9

changes in the AML program that the Compliance Officer has proposed. We address

Metalor's activities undertaken in response to certain of the specific recommendations

which we have seen during the third quarter and previous reviews.

**Second Quarter Recommendations:**

**AMI Recommendation 1**. Going forward, it might be a beneficial inquiry as part of routine due diligence, particularly in high risk areas, for Metalor to make an inquiry of potential new customers as to the major suppliers of precious metals for that new customer.

**Metalor's Response:** According to both Mr. Crogan some of Metalor's customers are

willing to provide supplier information, including PXMG, North Texas Refining,

Manhattan Gold and several others. We believe that such information will provide an

additional level of important information as to the source of precious metals from those

who do business with Metalor. It is not always possible for Metalor to secure this

information but an effort should be made.

**AMI Recommendation 2.** We recommend that the Compliance Committee undertake a more thorough approach to creating an agenda for each meeting, more detailed documented notes of the discussion and action points of each meeting and that documentation be made of open items and how they will be addressed in follow up meetings. While there has been improvement over this quarter, this effort should continue.

**Metalor's Response:** The minutes of the Compliance Committee have improved,

agenda have been provided and a genuine effort to meet the spirit of the

recommendation has been taken by Metalor.

**AMI Recommendation 3.** It was suggested that when training is done outside of Metalor headquarters, a list of those persons trained and the dates of the training be maintained at Metalor's headquarters and made available to the auditors.

**Metalor's Response:** Metalor has been keeping such records and has provided AMI

with the training log for October, 2007. There was a training session conducted of the

staff of Metalor, who work in the vault and receiving areas, which occurred in

December.  There was no log of the training session prepared; however, Metalor has

agreed to do so in the future.

**AMI Recommendation 4:**  The effort to make sure that new customer files for each
quarter are available when the monitoring occurs is important for a complete analysis.
In addition, there should be a system for reviewing new customer files for
completeness.  Perhaps in his new role as internal monitor, Mr. Bullock can take on the
role of reviewing new customer files for completeness and to insure that all final
approvals have been secured before such customers appear on the new customer
approved list.

**Metalor's Response:**  Given the change in the Compliance Officer, Mr. Bullock has not

been reviewing new customer files as they are developed and has not been signing off

on new customers as he had when he was Metalor's Compliance Officer.  We

recommended that Metalor consider returning to his review and sign off as an additional

level of review other than just Mr. Crogan, who is performing the bulk of the due

diligence developed and has the responsibility of signing off on new customers. This

should alleviate the issue we raised.  We recommendation that a second person review

the due diligence files before approval of new customers be completed.  The original

AML Program contemplated two individuals to approve new customers, the Compliance

Officer and the Director of Security.  This process served as a check system for the

company and it is recommended that the second signer ensure that all necessary due

diligence efforts have been completed and can also serve to make sure that any

questions, which remain about the potential customer, have been addressed.  Metalor

has taken this recommendation under advisement.

**Recommendations from Earlier Reports:**

**AMI Recommendation.**  AMI recommends that in the future, for purposes of
reporting to the Compliance Committee of the types of activities undertaken by

11

the Director of Security or others, who are looking into anti-money laundering programs or the indicia of legitimate businesses, that the details of the information developed be detailed to the Compliance Committee either in the form of a written report documenting the findings or in an oral report to the committee which is detailed in the minutes.

**Metalor's Response**:  This issue has been brought to the attention of the Compliance Committee.  We understand in speaking with Mr. Crogan and Mr. Bullock that the Committee is not provided written reports of activities but gets verbal updates only.

**AMI's Additional Comment**: Particularly as to those excursions to foreign countries, which involve meetings and communications with government officials, customer representatives and others, more specific reports of such interactions will provide the Committee which additional information upon which to base their business and policy decisions involving the AML program, Risk Assessments and continuing business relationships with customers.

**AMI Recommendation**.  AMI has recommended that the minutes of the Compliance Committee document the discussion, which occurs on each topic and which is raised at a meeting and not provide just a blanket statement as to a topic being discussed.   This will provide a more detailed chronicle of the Compliance Committee discussions, allows the Committee to track open items which are not resolved at a particular meeting and provide more documented evidence that there was some substance discussed on each particular agenda items addressed.

**Metalor's Response:**  Metalor has been addressing improving the Committee's minutes.

**AMI's Additional Comment:**  We agree that the minutes are more detailed and reflective of the discussion of the meetings.

**AMI Recommendation**. For new customers entered into the SAP Database of the company, AMI has recommended that Metalor's records of new customers entered into the Database be reconciled with the New Customer files maintained by Mr. Crogan, to

ensure new customer's due diligence files and they entry into the Database is accurate and the information on the customer, complete.

**Metalor's Response/Action:** We understand from speaking with Mr. Crogan that the

discrepancy occurs between those customers who are initially given temporary approval

and then entered into the data base but do not get "final approval" status. He describes

this as a house keeping issue that he will correct. This should alleviate the discrepancy.

## 5.    TRAINING OF NEW EMPLOYEES DURING THE THIRD QUARTER

There was a formal training for one new Metalor employee during the Fourth

Quarter. Metalor has retained documentation of the Sign-in sheet for the training as

well as the testing examination.

We have been informed that a training session occurred for Vault and Receiving

employees regarding what should be done in an inspection and in reporting details of

new materials they may be handling. Metalor did not keep a log of the attendees at this

training session but has committed to doing so in the future.

## 6.    REVIEW OF THE ACTIVITIES OF THE COMPLIANCE OFFICER AND INTERNAL MONITOR

This section addresses the general activities of Mr. Crogan in his role as

Metalor's Compliance Officer and Mr. Bullock in his role as Metalor's Internal Monitor.

We note that since the change to Mr. Crogan as Compliance Officer, the responsibilities

of the "Compliance Officer" have been altered somewhat. Mr. Crogan, in his role as the

Director of Security, continues the obligations of that position. As Compliance Officer,

he has assumed many of the responsibilities of the position as it was developed by Mr.

Bullock. However, with regard to the monthly review of the SAP reports, Mr. Crogan

has not taken over that responsibility. The monthly reviews continue to be performed by Mr. Bullock.

The following details the activities of Mr. Crogan in his role as Compliance Officer during the Fourth Quarter of 2007.

- As noted, Mr. Bullock continues to work with the reports generated by the IT department in his oversight of Metalor's anti-money laundering program in his role as Metalor's Internal Monitor. From his review of these reports and company records, Mr. Bullock generates monthly compliance reports which include New Customers, Monthly Sales and Customer Ranking Reports, Refining Reports, Ounces Settled Reports Bullion Reports and the incoming Karat Shipments by Territory Reports generated by Jake Shireman, Metalor's Manager of Customer Service. There is also a new report generated concerning the Materials Shipped to Metalor's Customers. We detail the specific analysis and conclusions drawn by Mr. Bullock below.

- Mr. Crogan, in his role as Director of Security and as part of the New Customer due diligence process, continues communication with Metalor's Refining Customers and potential customers regarding the certification of their AML programs.

- General Compliance oversight of new and existing accounts: Potential new customer accounts continue to be scrutinized through the efforts of the sales staff, Mr. Crogan and ultimately through the approval of the Compliance Committee. We also note that Mr. Crogan has begun the process of revetting Metalor's existing customers. We recommend that Metalor track existing

14

customers they have re-vetted in a spreadsheet format so as to be able to demonstrate this activity.

- Monitoring of wiring activities in and out of the company.  Mr. Bullock continues to track SAP reports based upon trends and unusual changes such as multiple payments made on any given day, particular customers of interest.   Mr. Crogan continues his efforts at tracking and investigating any suspicious wire activities and overseeing the approval process for wire transfers.

- Monitoring and reporting on Suspicious Activity continues to be monitored from sources both inside and externally.

- Communications with the United States Customs Department as they are documented or reported.

- Communications with various government officials both nationally and internationally about customers and potential customers.

- Assisting Metalor Switzerland with Due Diligence on International customers.

- Attendance at the "Madison Dialogue Ethical Jewelry Summit in Washington D.C.  This summit was designed to address ethical jewelry and small-scale mining operations.

## 7.  <u>COMPLIANCE COMMITTEE ACTIVITY</u>

Metalor's AML Compliance Committee met on three occasions during the third quarter, October 10, 2007, November 6, 2007 and December 4, 2007.   The composition of the committee has remained steady for some time now.  For the

meetings during this quarter, all four members of the Compliance Committee attended the meetings.  Mr. Beilstein attended the meeting of October 10, 2007.

We had previously recommended that the AML Compliance Committee prepare Agendas for their meetings.  That is now being done.  We also note that the quality of the minutes of the meetings has improved considerably and the minutes contain additional details and discussion than earlier meeting minutes had.  The improved documentation of the minutes provides insight into the consideration and activities of the Committee and serves several important functions, including the transparency with which Metalor is working, the consideration the Committee is giving to the AML program, the oversight by the independent monitor as well as a demonstrated commitment towards meeting its obligations under the Plea Agreement and the tenets of its AML program.

The minutes of the meeting held during this quarter reflect the following discussions and policy decisions of Metalor's Compliance Committee:

### October 10, 2007

The subject matters detailed in the agenda are of:  "Old Matters", "Trip Reports", "September monitoring" and "Other Matters".  (Note: we take the designation of "Old Matters" to mean open or ongoing matters which have been carried over from the previous or earlier meetings). We note that the minutes of the meeting reflect that the agenda was followed.

### Old Matters:

<u>HSBC Program</u>:  Mr. Drummond, Metalor's Chief Financial Officer and Compliance Committee member reported that the program was working well and noted

that the model of third party business transactions was being expanded to another customer. We note that in the report for the Second Quarter, we reported on the development and implementation of this program, which requires not only that the customer be vetted, but also that those parties to whom or from whom a delivery is to be made for the customer also be vetted.

Peru/Comarsa: The Committee was informed by Mssrs. Bullock and Crogan about their trips to Switzerland and the update that they had received from Metalor Switzerland that a hand-delivered notice was given to customers in Peru that Metalor Switzerland was terminating business with them at the of the current contract in December.

Atomic Gold: The minutes reflect the Mr. Crogan informed the Committee that five weeks had past after Metalor had made inquiries about a previous shipment, and that a new shipment had been delivered in late September. Mr. Crogan noted that he had followed this shipment up with communications with government officials.

Training of Shipping/ Receiving Personnel: The minutes reflect a description of training that Mr. Crogan conducted with personnel in the vault and receiving about inspections and reporting of new materials that come in to Metalor.

**Trip Reports**

Switzerland: Mr. Crogan provide some information about his trip to Switzerland in September and the exchanging of due diligence he conducted with Metalor Switzerland. He notes that of particular interest were insurance company risk assessments to be done in the near future.

17

Columbia:  Mr. Crogan discussed his trip to Columbia to a mining conference he attended as well as meeting with several customers and government officials, including DIAN.  He notes that he also met with the Colombia tax authority regarding the status of Escobar.  DIAN representatives reported to Mr. Crogan that Escobar had been fined but that there were no other outstanding issues concerning the company and that the company was in good standing.  Mr. Crogan also noted a meeting he had with the Ministry of Mines about taxes, and general changes and compliance.

September Monitoring:

Mr. Bullock discussed the monthly monitoring activities he undertakes and the steps he takes where he believes additional inquiry was required.  The Committee agreed that Mr. Bullock's internal monitoring efforts were sufficient.   Mr. Crogan added that based upon this information, where appropriate, he would undertake additional due diligence.  Finally it was noted that the sales representatives were adding significant value to the due diligence effort of the AML program.

Other Matters: A brief discussion is noted that the transition from Mr. Bullock to Mr. Crogan as Compliance Officer was going well.  Mr. Bullock added that his plan was to continue to perform the monitoring activities he had been performing through 2008.

**November 6, 2007 Meeting:**

The subject matters identified in the Agenda for this meeting included Old Matters, Trip Reports, Monthly Monitoring, Probation Reports and Merendon Mining.

Old Matters:

HSBC Program:  The minutes reflect a continuing sense that the program was working well and that the model had been applied to a customer from Los Angeles.

Peru:  Metalor Switzerland, according to Mr. Crogan terminated its business at the end of December 2007 with C.I. Fundicion Escobar,  Compania Minera Santa Rosa and Cia Minera San Simon S.A., Peru.

Atomic Gold: Metalor continues to monitor closely.

Trip Reports:

Mr. Crogan reported on his trip to Washington to participate in an international program regarding the sources of gold and the effort to ensure that legitimate practices were being followed.

Mr. Bullock described on his participation in the Bank Secrecy Act Advisory Committee, a national group that meets twice each year to advise the Treasury and FinCen about financial industry concerns.  The focus according to Mr. Bullock was suspicious activity reporting.

Mr. Bullock also reported on his presentation to AML officials from developing countries at the World Bank offices in Washington.

Monthly Monitoring:

Mr. Bullock reported on his monthly monitoring efforts and that his analysis revealed that in October, thirty of one hundred customers had their largest month of gold ounces settled.  He attributed this surge to the rising prices of gold.   Mr. Bullock indicated that the criterion of increased business as a measure of possible suspicious activity is difficult to apply in the current market.

Probation Reports:  Mr. Bullock reported that he had been contacted by the US Probation Department seeking verification of Metalor's AML program and training.  He said he would follow up to determine the type of verification needed.

Merendon Mining:  Mr. Crogan noted that the company had received an inquiry about this company which Metalor had declined to do business with in 2006.

Other Matters: Mr. Crogan informed the Committee that ICE Special Agent Andy Moore had been reassigned and that a new special agent would be taking over the case.  He also reported that he is familiar with the new SAC.

### December 4, 2007 Meeting:

The subject matters laid out in the Agenda for this meeting identified a number of continuing matters to be addressed, Trip Reports, November Monitoring, the Probation Report which was raised in November's meeting, AMI's Audit Report and several other matters.  All members of the committee were present for this meeting.

1.    **Old Matters:**

COMARSA –San Simon - Peru:  Mr. Crogan updated the committee on several developments in Peru.   He described a newspaper article that asserted that chemicals from mining operations had been diverted to the production of narcotics. The district attorney in Peru was investigating and had made inquiry of Mr. Crogan about Metalor's business with Peruvian companies.  According to Mr. Crogan, Metalor Switzerland responded to the inquiry and notified the government that Metalor does not and never has supplied chemicals to any mining operations and does not produce such chemicals. He further stated that Metalor's attorneys in Peru described their meeting with government officials as constructive.  He also noted that this is a Metalor Switzerland matter but that he continues to assist.  Mr. Drummond cautioned that Metalor USA is not engaged with any of the parties in question.  Mr. Crogan noted that he is in regular contact with US law enforcement officials about the matter.

Manhattan Gold:  Mr. Crogan informed the committee that there had been no new developments in this matter. He stated that he expects that there may be a request for additional information in the future. He further noted that Metalor's status in the matter is as a witness and not a target.

Merendon Mining – SEC Inquiry:  Mr. Crogan informed the committee that there were no new developments in this matter.  Metalor did not choose to business with this company.  Mr. Bullock noted that Republic Gold Refining did business with this company but should have thought better of it based upon available information about the company.

Escobar-Gutierrez files:  This Company recently switched its business to Metalor Switzerland.  Mr. Crogan noted that Metalor USA's files were being sent to Metalor Switzerland to supplement their files.  He further noted that the issues of Columbia taxes has not been finally resolved but that Mr. Crogan's investigations and direct meetings with Colombia tax authorities have permitted the continuation of business with this company.

2.    **Trip Reports:**

There were no reported trips by Mr. Crogan during the month of November.  Mr. Crogan noted that Mr. Beilstein had spent two weeks in China and looked into operations at Metalor's Hong Kong refinery.  He noted that although Metalor Hong Kong is part of Metalor Switzerland's operations, Metalor USA was assisting and needed to know about the coordination of activities with Hong Kong business.  Mr. Bullock noted that he would be participating in a FATF meeting in Switzerland in December which

would be writing an international guide on AML regulation for dealers in precious metals.

**3.     November Monitoring:** Mr. Bullock reported that he had not completed the internal monitoring at the time of this meeting.

**4.     Probation Report:** Mr. Bullock reported that AMI would be supplying the report to the U.S. Probation Department.

**5.     Audit Report:**  Mr. Crogan reported to the committee that the audit report of AMI for the Second Quarter had been received and that it was generally favorable regarding the transition to Mr. Crogan as the Compliance Officer and the increased due diligence activities that were being undertaken.

**6.     Other Matters:**

Money Laundering Alert Articles:  Mr. Crogan provided the committee with copies of articles he had received about enforcement of AML programs and the substantial penalties that were at stake.  He informed the committee that he subscribes to this journal as part of his overall training within the AML program.

Training:  As a follow up to an open item from previous meetings, Mr. Crogan described his training in the Shipping and Receiving and Vault departments concerning suspicious activity reporting particularly regarding unusual transactions and forms of materials received by Metalor.  This need for training arose out of a shipment received from Columbia that had been artificially converted into what appeared to be manufacturing scrap and a gold bar received from Metalor's customer, Atomic Gold that had been painted gray, which was believed to be an attempt to hide its value.

Financial Auditors:  There was discussion about a request from Metalor's Financial Auditors for AMI's most recent audit report, which was provided.  There was also a general discussion as to who should be permitted to receive or view the audit reports.  It was decided that because the reports contain sensitive information, particularly concerning suspicious activities, that the reports not be provided to banks or customers but that the financial auditors would need to know if the company is in financial jeopardy due to a possible failure to comply with the company's Plea Agreement with the government, which was not the case.

New Customer Cross Checks:  Mr. Bullock and Mr. Crogan discussed the cross checking of New Customers as they appear in the SAP Data Base against the paper records maintained by Mr. Crogan, to insure that they were consistent.

## 8.    MONITORING OF CUSTOMER TRANSACTIONS

Mr. Bullock, in his position of Internal Monitor, reviewed the business activities of new and ongoing customers during the Fourth Quarter through the reports generated from Metalor's SAP database.  Mr. Bullock analyzed the data to see if there were trends or spikes in business activities of Metalor Customers through the tracking of revenue, wire transfers, and bullion sales for all customers, to determine if any substantive changes required additional investigation to see if such activities gave rise to suspicious activities.

### Monitoring of New Customers through the SAP Data Base:

In conjunction with Mr. Crogan's efforts in conducting due diligence on potential new customers, Mr. Bullock reviewed Metalor's SAP generated reports tracking new customers to see if any new customers had not been approved by the AML Program.

23

According to the Mr. Bullock, during the months of October, November and December, 2007, each new customer had been approved through the Metalor's AML program.

**Monitoring of Customer Revenue Ranking:**

As had been his practice when he served as Metalor's Compliance Officer, Mr. Bullock prepared monthly "Monitoring – Sales and Ranks" report generated from his review and analysis of Data Base reports of customer business activity for the month, generated by Metalor's IT department.   The reports have been generated for about eighteen months now and provide a comprehensive sales history for each customer. For the October's review, Mr. Bullock tracked the sales back to November 2006.

Mr. Bullock reviewed the SAP Database reports that ranked the amount of business generated by Metalor's customers during the twelve-month period prior to the date of the month being reviewed.  The Metalor customer database reports reviewed each month includes **1**. the Ounces Settled for each customer during the month; **2**. the amount of gold and silver taken by a customer from its pool account or purchased from Metalor during each month; and **3**. Karat Gold Shipments to customers by Metalor generated from reports prepared by Jake Shireman, Metalor's Manager of Customer Services.

Mr. Bullock's stated purpose for these reviews are to check to see if there are any purchases or sales activities that are unusual for a particular customer or supplier or are transactions that are not in conformity with general industry practice standards. According to Mr. Bullock, during the time in which he has been conducting these monthly reviews of the sales activities of Metalor's customers, he has become attuned to the sales trends and historical business transactions of Metalor's customers.

24

**October Customer Ranking Report Review**:

Oz Settled during October 2007: Mr. Bullock reports that almost all (98.7%) of the gold and silver delivered by Metalor during the month was withdrawn from customer pool accounts with Metalor, i.e. they already own the gold.  This type of transaction is not considered a "sale of gold" under the AML Rule for Dealers in Precious Metals.

Mr. Bullock notes that all of the customers reviewed as part of this analysis are customers, who are known to him.  He also looked at the trends in such pool account withdrawals by comparing several customers' activities over a one year time period. He notes that the results reflect the increase in gold collections, which has resulted from the increase in gold prices as the reasons for any increases in pool account withdrawals and drew no conclusions that any increase in withdrawals was suspicious.

Pool Accounts and Withdrawals of Bullion during October 2007:  These reports detail the amount of gold and silver taken by a customer from their pool accounts maintained with Metalor.   In his report of his review of the Data Base information for Bullion for October, 2007, Mr. Bullock notes that almost all (98%) of the gold bullion that was delivered by Metalor had been withdrawn from customer pool accounts.  In other words, the customer already owned the gold that was withdrawn.   According to Mr. Bullock, nothing in the Pool Account withdrawals for the month of October was inconsistent with previous amounts for three customers he choose to review and nothing was suspicious in the information in this report.

Karat Gold Shipment Report through October 2007:  These reports look to see if there is any unusual activity by a customer or by a region in the shipment of gold to

Metalor.  The review includes consideration of the types of gold-bearing materials that are most vulnerable to money laundering activities:  high value and easily transportable.

In his report for the month of October, Mr. Bullock notes that Gold shipments during the month of October were down slightly from the previous month but were still high when compared to the previous year.  Mr. Bullock notes that for some customers, such as O'Hansons, the trend was not consistent with its large base and customer trend, was worthy of note.   Another customer whose gold shipments have continued to rise dramatically is North Texas Refining.  Mr. Bullock notes that Metalor has closely watched this company and that its sources of business are legitimate.

The increase includes the noted spikes in business C.I. Giraldo y Duque have also continued, he notes that Mr. Crogan has visited the company as has Metalor sales representative and determined that the sources of business are legitimate.

**November Customer Ranking Report Review:**

<u>Oz Settled Report</u>: The upward trend in gold settled with Metalor each month continued in November.  According to Mr. Bullock, this trend is based upon the continuing dramatic rise in the price of gold.  He found nothing in the increased amounts settled as giving rise to any suspicious behavior by Metalor's customers.  Mr. Bullock also notes that for several customers, Thunderbird from Los Angeles (which is owned by North Texas Refining) and the Gold Center, the increase volume is significant.  He also notes that Metalor's diligence in watching its customers is already high and that Mr. Crogan would be making direct contact with government authorities in Los Angeles regarding two customers, Thunderbird and Ohansons about the increase business and to exchange information.  This was not a suspicious activities report.

A number of customers had increases during the month or continued a trend of increased business over several months however; we also note that a number of customers, which had large increase during prior months actually had reductions in ounces settled in November, including Comoneda Compras De Mone, Manhattan Gold and Silver, PMXG, Gold Center LTDA.

Pool Accounts and Withdrawals:  From the Data Base report which provides data concerning customer withdrawals of gold from their pool accounts nothing was revealed in the transactions for November 2007 that was deemed suspicious.  Mr. Bullock reports that 98.35% of the withdrawals during the month were from customer pool accounts.

Karat Gold Shipment Report:  For the Karat Gold Shipment Reports during the month of November, Mr. Bullock report notes that November gold shipments were slightly higher than for the month of October.  As in previous months, the major increases in gold shipments continue to come from the Southwest region (North Texas Refining and Thunderbird) and as well as Laboratories Metales, Corporacion Sixtar and Duque and Goldex.

**December Customer Ranking Report Review:**

Oz Settled Report:  For the ounces of gold settled for the month of December 2007, the amounts of gold settled during the month continued the upward trend.  In reviewing the Oz Settled Report from the SAP Database, there are some customers for whom the amount settled had decreased during the previous month but others continued an upward trend.  Mr. Bullock concluded that other than the high volume, there was nothing in this report which provided indications of illicit activity.

For other precious metals settled during the month, one customer, C.J. Environmental settled 122 oz of platinum. It had not shipped platinum to Metalor previously and Mr. Bullock looked into this transaction. He discovered that the company and been using other refiners in the past and decided to give Metalor a try for this shipment. It was a single lot and, based upon this explanation, he did not see anything suspicious at hand. For Manhattan Gold, it settled abut 500 oz of platinum with Metalor during the month of December. When he made further inquiry, Mr. Bullock was informed that the amount was not unusual for this company, which is a jewelry collector.

Pool Accounts and Withdrawals:  In his report of his review of the bullion withdrawn from customer pool accounts for December 2007, Mr. Bullock notes that almost all (99.4%) of the gold bullion that was delivered by Metalor had been withdrawn from customer pool accounts. For one customer, A-Mark, it ranked first among private customers in withdrawals for the month. Mr. Bullock looked into it further and was informed by a Metalor representative, that A-Mark had been working with other refiners and decided to work with Metalor.

According to Mr. Bullock, nothing in the Pool Account withdrawals for the month of December was inconsistent with previous amounts for three customers he choose to review and nothing was suspicious in the information in this report.

Karat Gold Shipment Report:  For the month of December, Mr. Bullock only had the details for the first three weeks in the month for the Southwest Region. The information provided revealed that shipments were down from the previous month, and, with the holiday week following, were likely to remain at or below those levels for the remainder of the month.

28

**Monitoring of Wire Transfers**

Mr. Bullock continued his monthly review of wire transfer data compiled through the Data base, for the months of October through December 2007. His analysis and review of underlying transfer documentation is to determine whether or not, there was anything unusual about the wire transfers to Metalor customers where there were multiple wire transfers to the same customer on a given day. The following is a synopsis of the details revealed by the wire transfer reports for the quarter:

October Wire Transfer Reports:

There were sixty-eight (68) instances during October 2007 where there were multiple transfers for a given customer on a given day. It appears that the multiple wire transfers have increased as shipments have increased. This multiple wire transfers have been occurring with more frequency with several of Metalor's customers. For October, those companies where multiple wire transfers occurred on one day involved North Texas Refining (19 times), Comoneda Compras de Mone (13) PXMG (4).

Mr. Bullock notes in his report that he examined the transaction records and found that the wire transfers were supported by the underlying documentation for each transaction. He did not uncover any split payments made to customers, where the recipient of the payment is someone other than the customer.

According to Mr. Bullock, his review of these multiple wires transfers during October 2007 did not reveal anything suspicious.

November Wire Transfer Reports: The Wire Transfers for November, 2007 show that there were sixty-five (65) instances where more than one wire transfer occurred for a particular customer on a given day. Eighteen of these instances of multiple wire

29

transfers involved North Texas Refining; seven instances involved Precious Metals Exchange Group (PMXG); thirteen multiple transfers involved Comoneda Compras de Mone. On three dates, there were three or four separate wire transfers to Comoneda Compras de Mone during the month of November.

Mr. Bullock notes that he looked at the records for these wire transfers and that all of the transfers were supported by documentation underlying each of the transactions. For one customer, there were two identical wire transfers on the same day. Mr. Bullock investigated and found that the circumstances involved a cash shortage by Metalor at the time of the wire transfer and that the customer, David Fell agreed to take the wire transfers in two transactions.

In sum, Mr. Bullock found nothing suspicious from the multiple wire transfers, which occurred during the month of November, 2007.

December Wire Transfer Reports: There were fifty-seven instances where Metalor made wire transfers of funds to the same customer on the same day. The customers with whom this happened most frequently during the month continue to be North Texas Refining (seventeen) and Comoneda Compras de Mone (eleven), PMXG (Six). This trend has continued for months.

Mr. Bullock notes that he reviewed the paper records for there wire transactions and found that the wires were supported by records which indicated that each of these wire transfers involved separate transactions and not a splitting of one transaction into smaller sized payments.

**SAP Database Changes**

As part of the internal reviews of Metalor's business activities, Mr. Bullock monitors the SAP Database for any significant changes which may have occurred each month to search for any entry of a new unapproved customer through changes to the account of an existing approved customer such as a change of name, address or contact information. For the months during the Fourth Quarter, 2007, his review produced the following results:

October 2007 Customer Database Changes:

For the month of October, Mr. Bullock reports that he did not observe changes in the customer information, which would reveal any unapproved customers, or questionable changes in the database information about existing customers.

As he has in the past, Mr. Bullock notes that he eliminate customer 124698 because that number is assigned to Metalor's Sell Gold program, which is constantly changing to accept a new one-time customer.

Mr. Bullock determined that the report did not reveal any suspicious activity during the month of October.

November, 2007 SAP Database Review: Mr. Bullock reviewed Metalor's Database to determine if any changes in the identity of existing customers had occurred during the month. The only changes of note involved hospital name changes and involved hospital EP labs changing the identity of the customer from the hospital to the lab itself. No other significant changes were noted and Mr. Bullock found that none of the noted activities were suspicious.

31

December, 2007 SAP Database Review: As discussed in the report for the month of November, Mr. Bullock again commented on the name changes for those hospital/ labs that ship materials to Metalor. As concluded in November's review, there is nothing suspicious in the name change.

Based upon the review of the SAP Data Base for the month of September there was nothing or a suspicious nature uncovered.

9.     **NEW CUSTOMER TRANSACTIONS AND DUE DILIGENCE EFFORTS**

During the Fourth Quarter of 2007, Metalor accepted a number of new customers, all of whom were screened and approved through their New Customer due diligence process under its AML program. As we noted in AMI's Report for the Third Quarter of 2007, when conducting due diligence on new customers, Metalor generally does not look into the sources of the new customers' supply of precious metals. The instances where this would occur is if the new customer identifies it client / supplier; by circumstances that may come to the attention of Metalor as being a high risk area or if the compliance committee feels that such an investigation is required. We continue to recommend that, there is a beneficial inquiry to be achieved as part of routine due diligence, particularly in high risk areas, for Metalor to make an inquiry of potential new customers as to their major suppliers of precious metals for that new customer).

For each of the other new customers during the quarter, Mr. Bullock screened potential new customers through a variety of channels including investigations through government and other databases, communications with government officials, details provided by the new customer, information provided by Metalor's sales representatives and other sources of information.

As part of AMI's Monitoring, we review the new customer files prepared by Mr. Crogan. These records document the due diligence efforts undertaken by Metalor. Generally, the information contained in these records includes World Compliance Checks, background checks including the development of customer information including location, contact information, business entity, jurisdiction of incorporation, owners of company, communications with Metalor Sales Representatives, government officials and Metalor officials. Lexus- Nexus, D+B reports and Internet searches such as Google.  There is also information about the name of the customer's bank.  Most of the files also contain a copy of the AML certification required by Metalor.  We also review the reports generated by Mr. Bullock in which he reviews the New Customer accounts as revealed from the SAP Database.

## NEW CUSTOMERS OCTOBER 2007

According to the; New Customer report prepared by Mr. Bullock, six new customers were accepted by Metalor in October 2007. According to Mr. Bullock, all have been approved through Metalor's AML program. There is an additional customer, Precious Metals Reclaiming Service which also appears to have been approved in October but does not appear in the SAP Database report reviewed by Mr. Bullock.

### Ascent Healthcare Solution, Phoenix, AZ

This company is the largest recycler of medical equipment in the country.  They are a private company.  Mr. Crogan performed a due diligence check on the company in October 2007 and nothing of a derogatory nature was uncovered.

<u>C. I. Metales Hermanos S.A., Medellin, Columbia</u>

According to information provided by Metalor's sales representative, Metales Hermanos collects gold, silver and platinum from mining operations throughout Colombia as well as scrap jewelry. Its main office is located in Medellin, Columbia. References about the company were checked. Metalor's sales representative went to the company's office.

Mr. Crogan conducted a background search on the company and its principals, which revealed nothing of a negative nature. The company has certified under Metalor's AML program.

<u>Helen Andrews, New York</u>

This is a company which is also known as "Andina, Inc." out of New York City, falls into the HSBC Third Party program. HSBC has provided a letter of good standing to Metalor. The due diligence efforts by Mr. Crogan revealed nothing derogatory. We also understand that in September, 2007, Helen Andrews was looking to establish an "indirect customer" relationship with Metalor Singapore through its affiliate, Andina. The company was approved under the HSBC program.

<u>Johnson City Medical Center, Johnson City, TN</u>

This is a health facility which has been accepted as a new customer of Metalor's after Mr. Crogan completed his due diligence.

<u>Metalex - Quito, Ecuador</u>

This is a small mining company which refines its own productions as well as from other miners in the region. According to the information provided from the field, they were selling their material to Hermanos Ordonez but claim that due to local tax

regulations, they will now have to do their own exporting. The company has certified under Metalor's AML program. According the file compiled by Mr. Crogan, nothing derogatory was developed about the company or its principal, Luis Alejandro Ortiz.

<u>Precious Metals Reclaiming Service – Westwood, MA</u>

This is a precious metals recycling company. According to field reports, the company has been in business since 1974. Nothing negative was developed in the background investigation conducted by Mr. Crogan.

**NEW CUSTOMERS NOVEMBER 2007**

Metalor accepted eight new customers during the month of November, 2007 and one Third Party customer. One of these customers is a hospital. Five potential new customers were not approved. The files for these refining customers reveal the following efforts by Metalor at due diligence:

<u>Brinks - New York</u>

This matter came in through New York. Brinks is a primary carrier of precious metals internationally. The company needed to have Metalor refine a 100 troy ounce of fine gold that had spilled in its vault. Mr. Crogan approved Brinks as a customer in November, 2007.

<u>Conroe Regional Medical Center – Conroe, TX</u>

This is a medical customer which was visited by a Metalor representative in July, 2007 as part of the field review process. Nothing negative was uncovered by Mr. Crogan and the customer was approved.

35

### Fred Warsco – Indianapolis

Mr. Warsco is an individual who buys scrap gold from jewelry stores, pawn shops and coin shops. He was seeking to have Metalor refine the Karat Gold scrap. He completed Metalor's customer information package and was interviewed by Mr. Crogan. Nothing in Mr. Crogan's background check raised any red flags. Mr. Warsco apparently was approved as a new customer however; there is no Compliance Committee signoff in the file.

### Gaston Jewelry Studio, Inc – Miami

This is small jewelry manufacturer out of Miami, FL. The company certified under Metalor's AML program. There was nothing derogatory indicated from the background check performed by Mr. Crogan and the company was deemed a low credit risk and approved.

### J.Y. Analytical Services – Westerly, RI

This is a one-person assay business. Based upon its field work, it is anticipated that the company would be shipping small lots originating from assay business. Included in Mr. Crogan's due diligence activities was an interview with the owner, Jim Yip as well as reference checks. Nothing negative about the company or Mr. Yip was uncovered and the customer was approved.

### SBT Metals, LLC – Doraville, GA

This company is a subsidiary of North Texas Refining based in Georgia, which works as a precious metals and jewelry broker/ wholesaler. The company has certified under Metalor's AML program and the company was approved. We have some concerns about the multiple entities which appear to be under the control of North

36

Texas Refining and which have been approved by Metalor as new customers and separate business entities where it appears that the principals are identical or nearly identical.

### Victoga, Inc. – San Francisco

Victoga is a large jewelry manufacturer which Metalor has pursued as a potential customer for a number of years. Metalor has proposed to deliver to Victoga's customers under the same process as with the HSBC clients, which requires certifications from Victoga that its customers have their own due diligence processes. The file does not reveal whether or not Victoga has decided to follow that route. Mr. Crogan's background efforts included reference checks, communications with government officials and database searches. Nothing negative was uncovered and approval as a new customer was given.

### RMS Gold Assaying – Hong Kong

This was a request for Third Party approval by Metalor's customer, Sparkle Diamond Limited. The company certified under Metalor's AML program. Mr. Crogan conducted due diligence on the company and it was approved.

### Juan Carlos Paredes d/b/a/ GIMC – Bogota, Columbia

Mr. Paredes has approached Metalor several years earlier about becoming a customer. It was decided then not to pursue this business because of questions of legitimacy of the business. In November, 2007, Metalor's Sales Manager in Miami was contacted by this individual again, claiming to have business with other refineries. He also inquiries inquired about other customers, which Mr. Pereira did not discuss. The information was forwarded to Mr. Crogan who had communications with ICE as well

37

performing his due diligence. He recommended that the business not be pursued and the company was declined as a customer.

### Gold Station/ Francisco Vallejo – Bogota, Columbia

Information about this company and the individual caused concern at Metalor about the company's viability and the individual's background. They are linked to Lloren Trading Group, discussed below. After conducting his background checks, Mr. Crogan did not approve this business as a customer of Metalor.

### Lloren Trading Group

This is an entity out of Spain which claims to be in the business of sales of scrap copper, brass, slag of lead and copper.

### Heidi Farrell – Morgan Hill, CA

This individual applied to become a customer however, the application lacked details about a business name, address, customer transactions with MUSAR corporate description, bank or trade references. As a consequence, she was not approved as a new customer.

### Trilogy Digital Corp – St. Laurent, Canada

This is a metal processing company which was seeking to ship to Metalor for refining. Mr. Bullock conducted a due diligence investigation of the company, which revealed that the company was in a start up mode and did not have a facility for Metalor's sales representative to inspect. World Compliance and Google checks did not reveal anything derogatory however, as of November 29, 2007 the company was not approved as a customer.

### NEW CUSTOMERS, DECEMBER 2007

According to Mr. Bullock's report of his review of the SAP Database, Metalor accepted three new customers in September, 2007.   However, we have reviewed records of several additional new customers, which were approved by Mr. Crogan in December, 2007, which do not appear on the New Customer Database report reviewed by Mr. Bullock.  There were also two potential customers, who were declined. In both instances, ICE was notified. (See Suspicious Activity section of report, below).

#### Bridgeport Hospital – Bridgeport, CT

This is a medical /Cardio-Cath Lab, which was approved after Mr. Crogan completed his due diligence check.

#### Palmetto Richland Memorial Hospital – Columbia

This is a medical customer.  Due diligence was completed and nothing derogatory was uncovered.

#### Yakov Telyas – New York

Mr. Telyas is an individual who formerly worked at Hi Tel Trading Co. and Telyas Ltd.  He was looking to get back into the precious metals business after retiring initially. He has certified that he is not subject to the requirements of 31 CFR 103.40.  Mr. Crogan's background checks revealed nothing negative about this individual.

#### Finger Mate Inc. – Hallandale, FL

This company is a jewelry manufacturer, which was looking to switch to Metalor for its refining.  The company submitted an application and certified under Metalor's AML program.  Mr. Crogan's background investigation revealed nothing derogatory and the company was approved on December 28, 2007.

<u>Cellar Coin – San Diego, CA</u>

This company was previously a customer of Metalor. It had stopped using Metalor when Metalor raised its prices several years earlier but was looking to return. There were no problems with the company in the past. Mr. Crogan conducted a due diligence check on the company, which uncovered nothing negative in nature. The Company certified under Metalor's AML program.

<u>Leon Zylberman d/b/a Precision Jewelers, Watch and Clock Shop</u>

Mr. Zylberman is an elderly gentleman, who has a court appointed guardian. The potential business involved the disposition of jewelry after a burglary and fire in 2002. Mr. Crogan was uncomfortable in the communications he had and declined approval.

<u>African Based Investments, LLC</u>

This principal of this company is a licensed osteopath out of Oklahoma who apparently runs several health clinics in West Africa. He was seeking to work with North Texas Refining on gold shipments from West Africa. Mr. Crogan has communicated to North Texas Refining of its concerns about any business from West Africa as well as recommending that it not to do business with this entity. Mr. Crogan forwarded this information to ICE. The company was not approved.

**NEW CUSTOMER MATERIALS**

In addition to monitoring new customers under the AML program, Mr. Bullock has been tracking the materials shipped by Metalor's customers to see if there are any unusual materials shipped by a particular customer. This information is derived from a new report generated from the SAP Database.

For October 2007, there were twenty-three such transactions. Mr. Bullock did not determine that any of these shipments constituted suspicious activities. He looked at a couple of lots involving a new customer, Precious Metals Reclaiming Service, who shipped karat gold which contained 10% platinum. Mr. Bullock found this was not suspicious. He also looked at another shipment from CJ Environmental which also contained platinum/ iridium. However, upon closer review, the shipment contained platinum and was not suspicious.

The Report for the month of November indicates that the report generated by the IT department was erroneous, was pulled from circulation and was not considered by Mr. Bullock. The December report was also found to be erroneous and was not relied on by Mr. Bullock.

## DUE DILIGENCE FOR METALOR SWITZERLAND CLIENTS

As we noted in our reports for the second and third quarters, Mr. Crogan has assisted Metalor Switzerland with due diligence on matters including customers from Peru, Africa and other parts of the world. His efforts in looking at new and ongoing business continued throughout the third quarter, including activities involving Peruvian clients detailed at the start of this report.

One new development from the efforts of Mr. Crogan in assisting Metalor Switzerland, which came to light as the result of a Columbian news article involving Rex Gold is the need for a company-wide list of those unwelcomed or "Blacklisted" companies and individuals. This effort is underway and should be in place during the First Quarter of 2008.

41

As noted in the report of the Third Quarter, we questioned Mr. Crogan about the obligations Metalor USA's AML program places upon the Compliance Officer when conducting due diligence on behalf of Metalor Switzerland. He stated unequivocally that reports of suspicious activities are handled in the same manner as with customers of Metalor USA and that he has maintained open communications with federal and international authorities on all such matters.

Mr. Crogan also monitors and disperses information developed about news reports and other information developed about possible money laundering activities throughout Metalor USA and Metalor Switzerland.

We describe below the due diligence activities conducted by Mr. Crogan for Metalor Switzerland during the third quarter of 2007.

C. I. Fundicion Escobar:

In December 2007, Mr. Crogan was requested by Metalor Switzerland to forward Metalor USA's due diligence files on C. I. Fundicion Escobar and Gutierrez. The files were then transmitted to Metalor Switzerland. Within the files transmitted are Metalor USA's historical due diligence and business activity files as well as a detailed report from Mr. Crogan concerning his meetings and communications with Government Officials in Columbia regarding the taxation of exported precious metals. The report of these communications and his notes of meetings and conversations are well documented.

10. **SUSPICIOUS ACTIVITIES**

During the three month from October 1 through December 31, 2007 there were six reports of suspicious activities made to ICE. We characterize the communications

by Mr. Crogan as "reports" but, as we noted in our previous report, these communications can consist of telephone calls and email correspondence. There are no formal "reports" as that term is generally used.   In addition to the usual types of communications which occur between Mr. Crogan and ICE representatives as part of his due diligence process, Mr. Crogan also specifically reported a number of matters as "Suspicious Activities" during the Fourth Quarter. We address communications to ICE of suspicious activities by Mr. Crogan below:

**Manhattan Gold:**

We had reported previously that Metalor had received a subpoena duces tecum in a Grand Jury Investigation out of the Office of the District Attorney for Kings County, New York. ICE has been kept apprised of developments and has been provided a copy of the subpoena.

**Merendon Mining (Colorado)**

In November 2007, Metalor received a subpoena duces tecum from the Securities and Exchange Commission out of Denver, CO seeking documents related to Metalor Technologies USA and Metalor USA Refining Corporation business dealings with Merendon as well as communication files with seventy businesses and forty-six individuals. Metalor responded by producing documents retrieved from its sales representatives and internals files of documents which corresponded to the items described within the subpoena.  We understand that ICE has been apprised of this matter.

**African Based Investments**

This company was not approved by Metalor because of concerns about the business it was seeking to do from West Africa. This principal of this company is a licensed osteopath out of Oklahoma who apparently runs several health clinics in West Africa. He was seeking to work with North Texas Refining on gold shipments from West Africa. Mr. Crogan has communicated to North Texas Refining of its concerns about any business from West Africa as well recommendations that it not do business with this entity. Mr. Crogan forwarded this information to ICE. The company was not approved.

**Leon Zylberman d/b/a Precision Jewelers, Watch and Clock Shop**

Metalor was contacted in November, 2007 about this potential customer who is an elderly man and has a court appointed guardian. The business involves the disposition of the remains of a jewelry company which suffered a burglary and arson in November, 2002 according to counsel. According to Mr. Crogan, he was very uncomfortable with the communications with this potential customer and declined to do business with them. He notified ICE as a consequence of his discomfort level.

**Precious Metals Exchange Group (PMXG)**

There have been a number of communications between Mr. Salisbury from ICE and Mr. Crogan regarding this account. There was an inquiry seeking details of Metalor's business activities with PMXG including banking details, transportation modes, dates of deliveries, amounts of deliveries, payments as well as a list of PMXG customers. Mr. Crogan and Metalor have replied through the submission of multiple documents containing details of the monthly amounts of gold processed, Metalor's revenues for services rendered, payment history to the customer and wire details.

**U.S. TREASURY FRAUD EMAIL**

On December 13, 2007, an E-mail from the U.S. Department of Treasury was directed to Metalor Employee and AML Compliance Committee member Aprylle Wright stating that a complaint had been brought against Metalor for tax avoidance and money laundering schemes.  The complaint was to have been brought by a "Benjamin Kent". Mr. Crogan then communicated with Andy Moore and informed of the email and forwarded it to him.  The email contained an attachment which was feared to have been contaminated.  It was thought that the email was fraudulent and the Cyber Crime Unit at ICE was to look at the attachment.

There were no internal reports of suspicious activities during the Fourth Quarter of 2007.

## 11.    WIRE TRANSFER CHANGE REVIEW

Generally, AMI has been receiving files of customers requesting changes in their banking and wiring instructions.  During the months from October through the end of December, 2007, we have received only one instance where this occurred.

October, 2007: Wire Transfer Changes:

Gold Center changed banks.  Mr. Crogan looked into the new bank and found nothing derogatory about the bank, "Alianza Valores, and approved the change.

We note that as part of the wire instruction change request during July involved changes in account numbers.  Mr. Crogan approved the wire changes.  Nothing suspicious was noted in the wire transfer requests in July, 2007.

November and December 2007 Wire Transfer Changes: No Reports of Wire Transfer requests or approvals have been provided for these months.

## 12.    CUSTOMS DOCUMENTATION REVIEW

In October, 2007 Metalor received a request from Brinks for the completion of a Customs Census Check which had resulted from a discrepancy in the ratio price versus gram content. Upon review, it was determined that the information was correct.

As noted in our previously reports, based upon his activities as the Compliance Officer for Metalor, Mr. Bullock felt that since he had been examining these documents, he did not find them to serve as a useful tool for identifying suspicious activities by Metalor's customers. While it had been reported by Mr. Bullock that Metalor was going to eliminate these reports as part of the reviews, that decision is going to be revisited by Mr. Crogan.

## 13.    CUSTOMS REPORTING

Mr. Crogan and Mr. Bullock maintain records of their communications with the Customs Department. Mr. Crogan reports that he is in regular communication with ICE through both phone and electronic communication channels. In this report, we have detailed several of the communications between Metalor and ICE.

In addition to the matters noted in this report, we also note that Metalor continues to cooperate with ICE on multiple matters involving suspicious activities and now, since Mr. Crogan's employment with Metalor, as part of the due diligence activities he conducts of potential new customers and existing customers as well his efforts on behalf of Metalor Switzerland.

## 14.    COMMENTS

Metalor continues in its efforts to implement, improve and update the company's AML program and with its customers. They do so through continued scrutiny of

46

potential new customers, review of the ongoing business relationships it has with its existing customers and in maintaining close scrutiny of the activities in the "at risk" areas of this industry where money laundering and other illegal activities most likely could occur.

We discussed with Mr. Crogan about further improvements he is contemplating as the company's Compliance Officer. The areas we discussed concerned standardizing the due diligence efforts he performs for Metalor Switzerland and developing a global prohibited customer list.

As previously noted, Metalor's cooperation with the Affiliated Monitors monitoring activities continues to be excellent. There is nothing that we have asked for which has been withheld or has there been any hesitancy in providing us with information.

We also note that Mr. Crogan continues to be very active in monitoring and investigating suspicious activities or matters which he believes requires additional scrutiny even if they do not rise to the level of suspicious activity. His efforts include contact with government officials as well as travel to various locations where Metalor's customers are located.

There is nothing that arose to the level of suspicious activity that had either not been reported to ICE or noted by Metalor that has been brought to Affiliated Monitors attention or that we uncovered as part of our monitoring during the third quarter of 2007.

## 14.    RECOMMENDATIONS

Based upon our review of Metalor's compliance efforts during the Fourth Quarter of 2007, we make the following recommendation:

47

1.   Additional documentation of the actual meetings and communications with the various government officials and representatives of customers would provide greater depth to specific interactions with these individuals and entities.  As we noted above, the documentation of the trips and communications with Columbian government officials in the C. I. Fundicion Escobar is excellent and should provide a model for the types of documentation which should be maintain in other such instances.

2.   We recommend that Metalor track existing customers they have been re-vetted or additional due diligence has been developed, in a spreadsheet format so that it can more readily be determined as to those customers who have been through such additional scrutiny and to be able to cross-check Metalor's files.

## 15.   <u>NEXT AUDIT REPORT</u>

The audit for the First Quarter of 2008 will be conducted and the report will follow over the next several weeks.


Date:  April 10, 2008


Vincent L. DiCianni
Authorized Representative of
AFFILIATED MONITORS, INC.


Dennis Kelleher
Auditor


48